**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GARY SHAPLEY and

JOSEPH ZIEGLER,

                        Plaintiffs,

        —*against*—

ABBE LOWELL,

                        Defendant.

1:24-cv-02646-RJL

**DEFENDANT ABBE LOWELL'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTION TO DISMISS**

STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

November 18, 2024

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 5

  A. Confidentiality in Criminal Tax Investigations .......................................... 5

  B. Plaintiffs and Their Role in the Hunter Biden Investigation ..................... 6

  C. Shapley's Lawyer Engages with Congress and the Media ........................ 8

  D. After Shapley and Ziegler Are Removed from the Biden Case, Shapley Himself Goes Public ...................................................................... 10

  E. Shapley and Ziegler Testify Before the House Ways and Means Committee ..................................................................................... 11

  F. Shapley and Ziegler Continue the Press Tour............................................ 11

  G. Hunter Biden's Lawyers Urge the Justice Department and Congress to Put a Stop to the Unlawful Disclosures ............................... 14

  H. Hunter Biden Sues the IRS Over the Unlawful Disclosures..................... 16

  I. Plaintiffs Claim Credit for the Justice Department Bringing New, Felony Charges Against Hunter Biden............................................. 17

  J. Plaintiffs File Suit ...................................................................................... 17

STANDARD OF REVIEW ...................................................................................................... 17

ARGUMENT ........................................................................................................................... 18

 I. The Challenged Statements Are Nonactionable Legal Opinions, Not Provably False Statements of Fact............................................................18

 II. The Court Need Not Assess the "Truth" of Lowell's Opinion That Plaintiffs' Conduct Was Unlawful, But, In All Events, Lowell's Opinion Is Well-Founded .........................................................................22

 III. Plaintiffs Fail to Plead Facts Showing Actual Malice ...........................27

 IV. The "Legislative Privilege" Bars Plaintiffs' Claims.............................31

CONCLUSION....................................................................................................................... 33

# TABLE OF AUTHORITIES

**CASES**

*Allen v. United States*,
    390 F.2d 476 (D.C. 1968) ................................................................. 5

*Arpaio v. Cottle*,
    404 F. Supp. 3d 80 (D.D.C. 2019) ..................................................... 29

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................... 17, 18

*Banks v. Kramer*,
    603 F. Supp. 2d 3 (D.D.C. 2009) ....................................................... 31

*Biden v. U.S. Internal Revenue Service*,
    No. 23-2711, 2024 WL 4332072 (D.D.C. Sept. 27, 2024) ................. 16, 17, 23

*Church of Scientology of California v. Internal Revenue Service*,
    484 U.S. 9 (1987) ............................................................................ 24

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.*,
    173 F.3d 725 (9th Cir. 1999) ............................................................ 21

*D.A.M. v. Barr*,
    474 F. Supp. 3d 45 (D.D.C. 2020) ...................................................... 6

*DeSantis v. Employees Passaic Cnty. Welfare Association*,
    568 A.2d 565 (N.J. Super. Ct. App. Div. 1990) ................................... 32

*Dial A Car, Inc. v. Transportation, Inc.*,
    884 F. Supp. 584 (D.D.C. 1995) ........................................................ 21

*Dilworth v. Dudley*,
    75 F.3d 307 (7th Cir. 1996) ............................................................. 28

*Douglas Oil Co. of California v. Petrol Stops Northwest*
    441 U.S. 211 (1979) ......................................................................... 5

*Fairbanks v. Roller*,
    314 F. Supp. 3d 85 (D.D.C. 2018) ..................................................... 29

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ........................................................... 6

*Florio v. Gallaudet University*,
    619 F. Supp. 3d 36 (D.D.C. 2022) ................................................. 19, 20

*Fund for Constitutional Government v. National Archives and Records Service*,
  485 F. Supp. 1 (D.D.C. 1978) ........................................................................ 24

*Hellmuth v. Efficiency Energy, L.L.C.*,
  No. CV H-14-2945, 2016 WL 642352 (S.D. Tex. Feb. 18, 2016) ................... 20

*Hoffman v. Hill & Knowlton, Inc.*,
  777 F. Supp. 1003 (D.D.C. 1991) ................................................................... 33

*Houlahan v. Freeman Wall Aiello*,
  15 F. Supp. 3d 77 (D.D.C. 2014) .................................................................... 18

*Hourani v. Psybersolutions LLC*,
  164 F. Supp. 3d 128 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017)................. 29

*Imperial v. Drapeau*,
  716 A.2d 244 (Md. 1998) ................................................................................ 32

*In re Motions of Dow Jones & Co.*,
  142 F.3d 496 (D.C. Cir. 1998) ......................................................................... 5

*In re North*,
  16 F.3d 1234 (D.C. Cir. 1994) ......................................................................... 27

*In re Sealed Case No. 99-3091*,
  192 F.3d 995 (D.C. Cir. 1999) ......................................................................... 27

*\*Jankovic v. International Crisis Group*,
  822 F.3d 576 (D.C. Cir. 2016) ......................................................................... 28

*\*Johnson v. Sawyer*,
  120 F.3d 1307 (5th Cir. 1997) ................................................................... 25, 26

*Kahl v. Bureau of National Affairs, Inc.*,
  856 F.3d 106 (D.C. Cir. 2017) ......................................................................... 18

*Lampert v. United States*,
  854 F.2d 335 (9th Cir. 1988) ........................................................................... 25

*Langeman v. Garland*,
  88 F.4th 289 (D.C. Cir. 2023) .......................................................................... 31

*Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*,
  838 F.2d 1287 (D.C. Cir. 1988) ....................................................................... 29

*Mallas v. United States*,
  993 F.2d 1111 (4th Cir. 1993) ................................................................... 25, 26

*McFarlane v. Esquire Magazine,*
    74 F.3d 1296 (D.C. Cir. 1996) ........................................................................ 29

*McSurely v. McAdams,*
    502 F. Supp. 52 (D.D.C. 1980) ......................................................................... 6

*Moldea v. New York Times Co.,*
    22 F.3d 310 (D.C. Cir. 1994) ............................................................................ 18

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .......................................................................................... 29

*Nicosia v. De Rooy,*
    72 F. Supp. 2d 1093 (N.D. Cal. 1999) ............................................................ 21

*Ollman v. Evans,*
    750 F.2d 970 (D.C. Cir. 1984) ......................................................................... 20

*Parisi v. Sinclair,*
    845 F. Supp. 2d 215 (D.D.C. 2012) ................................................................ 29

*Perez v. Weaver,*
    No. 6:22-CV-127, 2022 WL 22863218 (E.D. Ky. Dec. 14, 2022),
    *report adopted,* 2023 WL 11897158 (E.D. Ky. Apr. 21, 2023) ....................... 21

*Pitt Chemical & Sanitary Supply Holding Co., Inc. v. Generational Equity, LLC,*
    No. 1839 WDA 2012, 2013 WL 11247583 (Pa. Super. Dec. 24, 2013) ......... 21

*Reuber v. Food Chemical News, Inc.,*
    925 F.2d 703 (4th Cir. 1991) ........................................................................... 28

*Rodgers v. Hyatt,*
    697 F.2d 899 (10th Cir. 1983) ......................................................................... 25

*Rodriguez v. Panayiotou,*
    314 F.3d 979 (9th Cir. 2002) ........................................................................... 21

*Rowley v. United States,*
    76 F.3d 796 (6th Cir. 1996) ............................................................................. 25

*Shive-Ayala v. Pacelle,*
    No. 21-704 (RJL), 2022 WL 782412 (D.D.C. Mar. 15, 2022) ......................... 6

*Thomas v. United States,*
    890 F.2d 18 (7th Cir. 1989) ....................................................................... 25, 27

*United States v. Forman,*
    71 F.3d 1214 (6th Cir. 1995) ............................................................................. 5

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988) ................................................................. 5

*Vreven v. American Association of Retired Persons*,
    604 F. Supp. 2d 9 (D.D.C. 2009) ...................................................... 33

*Webster v. Sun Co., Inc.*,
    731 F.2d 1 (D.C. Cir. 1984) .............................................................. 31

*Webster v. Sun Co., Inc.*,
    790 F.2d 157 (D.C. Cir. 1986) .......................................................... 32

*Wright v. Eugene & Agnes E. Meyer Foundation*,
    68 F.4th 612 (D.C. Cir. 2023) .......................................................... 19

*Zimmerman v. Al Jazeera America, LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) .................................................. 29

## STATUTES

18 U.S.C. § 401 ................................................................................................ 5

26 U.S.C. § 6103 ..................................................................................... *passim*

26 U.S.C. § 7213 .......................................................................................... 2, 6

5 U.S.C. § 552a ............................................................................................. 16

D.C. Code § 12–301(a)(4) ........................................................................... 32

## RULES

Fed. R. Crim. P. 6(e) ...................................................................................... 5

## TREATISES

1 Wright & Miller, Federal Practice & Procedure Criminal § 107 (5th ed. 2023) ...................... 27

Restatement (Second) of Torts § 566 (Oct. 2022 update) ........................................... 19

Restatement (Second) of Torts § 588 (1977) ....................................................... 31, 33

Restatement (Second) of Torts § 590A (1977) ......................................................... 31

## INTRODUCTION

Defendant Abbe Lowell is a criminal defense lawyer who has long represented Hunter Biden. Lowell seeks to dismiss this defamation action against him because the alleged defamatory statements—which collectively assert that it was unlawful for two self-styled IRS "whistleblowers" to engage in a months-long media blitz exposing the inner workings of the Biden criminal investigation—are nonactionable legal opinions, not provably false statements of fact. In addition, the Complaint lacks factual allegations to show the required "actual malice," relying instead on bare legal conclusions. What is more, the allegedly defamatory statements are categorically protected by the "legislative privilege" because the statements were made in a letter response (either in the body of the letter or in its enclosures) to a congressional request.

Plaintiffs are two disgruntled IRS special agents, Gary Shapley and Joseph Ziegler, who were removed from the Biden case in early 2023 by their supervisors because their relationship with Justice Department attorneys had deteriorated beyond repair. Plaintiffs thought the case was being "slow-walked" and that felony tax charges were long overdue—so they went public. It is a familiar tactic of line agents who believe they know better than prosecutors to surreptitiously leak information to the media so as to generate external pressure on the decisionmakers. Here, in a variation on that tactic, Shapley and his lawyer openly went to the media claiming that Shapley was a "whistleblower" who wanted an audience with the House Ways and Means Committee to tell his story about Biden receiving "preferential treatment." The Committee—receptive to suggestions of scandal within the Biden administration—conducted a closed-door interview with Shapley, and, shortly thereafter, with Ziegler. The Committee then voted along party lines to publicly release the testimony and investigation materials.

Plaintiffs spent the following months complaining to any media outlet they could find that Biden was not being treated severely enough by DOJ prosecutors. In doing so, Plaintiffs laid

bare details of how the grand jury investigation unfolded, their assessment of the evidence and of Biden's criminal intent, what charges they wanted prosecuted, and gratuitously embarrassing investigative details, such as Biden allegedly writing off escort payments as business expenses.

Weeks after the Committee testimony, the Justice Department announced misdemeanor tax charges to which Biden had agreed to plead guilty under a plea agreement (as well as a gun charge that would be subject to a diversion agreement). As Plaintiffs continued their press tour, they made clear that they believed the tax charges were inadequate, and that, based on what Plaintiffs learned in working and supervising the case, more serious charges were warranted. After the planned plea later fell through, the Justice Department—clearly influenced by the public spectacle Plaintiffs and the public officials with whom they were working unleashed— charged Biden with more severe tax felonies. Plaintiffs publicly claimed vindication.

To state the obvious, this is not remotely how things are supposed to work. Criminal investigations typically occur outside the public eye, with the government either issuing a public indictment, or saying nothing publicly about what was uncovered (or even about *who* was being investigated). And charging decisions are supposed to be made by professionals giving sober, careful consideration to all the evidence. There is no role for a political mob wielding a highly selective subset of politically-motivated, improper disclosures of investigative information.

This entire process in the Biden case was not only unusual, but involved serious illegality. Government officials have a solemn duty, embodied in Rule 6(e) of the Federal Rules of Criminal Procedure, to keep secret anything arising from the grand jury's work. Worse, it is a felony for investigators to disclose tax "return information," which is defined broadly to include the fact of a tax investigation or any details about it. 26 U.S.C. § 7213(a)(1); 26 U.S.C. § 6103(b)(2). Plaintiffs violated these provisions over and over again.

When the press bonanza was first underway, starting with an October 2022 *Washington Post* story, Biden's then-attorney, Christopher Clark, did what any attorney would do to zealously advocate for his client: he repeatedly urged the Justice Department in writing to put a stop to the highly prejudicial—and unlawful—leaks and improper disclosures. Lowell, who later joined Clark in representing Biden, made similar appeals in the hope that *someone* at the Justice Department would do *something* to rein in Plaintiffs. It appears no one did.

A collection of the Lowell and Clark letters—sent together in a production to Congress in response to a formal request from three Committee Chairs—form the basis of Plaintiffs' claims. Plaintiffs allege that Lowell is responsible for republishing twelve "Defamatory Allegations" in the letters (identified as "A" though "L"). The substance of each is the same: that one or both Plaintiffs violated the law by publicly disclosing information about the Biden case.

Plaintiffs cast these accusations as "false" because Plaintiffs supposedly acted lawfully at all times. Their theory is *not* that the information they disclosed about the Biden case (including disclosures through their attorneys) falls outside either Rule 6(e) or the statutory definition of protected "return information." Rather, the theory is that the House Ways and Means Committee's decision to release their closed-door testimony placed the matter in the "public domain" and freed Plaintiffs to discuss the case with whomever they wanted, in whatever specifics they wanted, for as long as they wanted. But four federal Courts of Appeals have interpreted the taxpayer protection statute at issue to *not* include any such "public domain" exception (with one or arguably two Courts of Appeals going the other way). And courts similarly have rejected the notion that the leak of grand jury information categorically vitiates the obligations of grand jury secrecy under Rule 6(e) or otherwise provides a license for further leaks of even the same information.

- 3 -

But this Court need not reach the validity of Plaintiffs' "public domain" theory, because the Complaint can and should be dismissed on a more fundamental ground: defamation can be premised only on provably false statements of fact, not legal *opinions* (to say nothing of a legal opinion that is the subject of a Circuit split). One can only imagine the massive chill on public discourse that would arise if a speaker or writer could be saddled with a defamation judgment for announcing a position on a legal issue that a court later disagrees with. That is why courts routinely dismiss cases like this one. Plaintiffs may feel very strongly that they acted lawfully, but Lowell holds very different views—and has every right to say so.

Separately, Plaintiffs are required to plead facts showing "actual malice" because they have injected themselves into a public matter and hence are "limited-purpose" public figures. The exacting "actual malice" standard requires that they set forth facts showing that Lowell "knew" or recklessly disregarded that his accusations were false. This is commonly shown where, for instance, a defendant relied on fabricated information or a source that no one would credit. But nothing like that is alleged here. Plaintiffs merely plead, in a conclusory fashion, that Lowell "knew" the statements were "false," without *any* facts to plausibly support that inference.

Finally, communications to a legislative body like Congress are categorically protected from defamation liability for the important reason of ensuring full disclosure. Here, Lowell submitted the September 2023 letter (inclusive of enclosures that together contain all the alleged defamatory statements) in compliance with a written demand from three House Committee Chairmen to produce all communications between Biden's attorneys and the Justice Department. The whole purpose of the "legislative privilege" is to allow citizens like Lowell to respond fully and without fear of lawsuits like this one. The Complaint vaguely refers, with no specifics, to

Lowell subsequently publishing the letters to the "media," but the defamation pleading standards require the audience to be identified with more specificity than that.

The Complaint should be dismissed with prejudice.

## BACKGROUND

### A.    Confidentiality in Criminal Tax Investigations

Federal criminal investigations are not intended for public consumption. If the government is to say anything publicly at all about a criminal investigation, it should be through an indictment and court proceedings, not media leaks or a public-relations campaign. This bedrock principle is reflected in Rule 6(e) of the Federal Rules of Criminal Procedure, which states that government personnel "must not disclose a matter occurring before the grand jury." Fed. R. Crim. P. 6(e). This rule broadly protects the identity of witnesses, the substance of their testimony, as well as "the strategy or direction of the investigation, the deliberations or questions of jurors, and the like." *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998) (internal citations and quotation marks omitted).

Grand jury secrecy is essential to the "proper functioning of our grand jury system." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). It protects an "accused who has not been indicted" against "derogatory" disclosures, *Allen v. United States*, 390 F.2d 476, 480 (D.C. 1968), and, if an indictment is returned, protects the "defendant's right to a fair trial before a petit jury." *United States v. Friedman*, 854 F.2d 535, 583 (2d Cir. 1988). Violations are punishable as criminal contempt under 18 U.S.C. § 401. *See, e.g.*, *United States v. Forman*, 71 F.3d 1214, 1217 (6th Cir. 1995).

Federal law also strictly protects the tax information of Americans. It is a felony for federal employees to disclose "return information," which is defined broadly to include any "data" received by the government "with respect to a [tax] return or with respect to the

determination of the existence, or possible existence, of liability"—in other words, any investigative information. 26 U.S.C. § 7213(a)(1) (felony provision); 26 U.S.C. § 6103(b)(2) (defining "return information"). The "overriding purpose" of these provisions, adopted on the heels of abuses by the Nixon White House, is to "protect tax returns and return information from misuse" by government officials, especially those who would use the information "for partisan political purposes." *McSurely v. McAdams*, 502 F. Supp. 52, 56 (D.D.C. 1980).

The backdrop for this case is Plaintiffs' failure to heed these important legal obligations. Plaintiffs are responsible for a barrage of disclosures about the criminal investigation of Hunter Biden, both before and after his indictment, yet are suing Biden's defense counsel, Abbe Lowell, for having the temerity to call out their outrageous and unlawful behavior.

### B.    Plaintiffs and Their Role in the Hunter Biden Investigation

Plaintiffs Gary Shapley and Joseph Ziegler are IRS Criminal Investigation (IRS-CI) special agents who began working on the criminal tax investigation of Hunter Biden in 2020 and 2018, respectively. (Compl. ¶¶ 4-5; Ex. 1, at 169; Ex. 2, at 47.)[1] The grand jury investigation was overseen by the U.S. Attorney for the District of Delaware, David Weiss, who had been appointed by President Trump, and run by career prosecutors in his office. (Ex. 1, at 13-14.)

_____

[1] Citations in the form "Ex. __" refer to the exhibits to the accompanying Declaration of Charles Michael. All these exhibits are properly considered on a motion to dismiss, where the Court may consider "the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013). The exhibits include, for example, the letters that are incorporated into the Complaint as the source of the alleged defamatory statements; transcripts of Plaintiffs' Congressional testimony, which are both judicially noticeable, *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020), and incorporated into the Complaint; and transcripts and published reports of Plaintiffs' media appearances, which are integral to the underlying defamation allegations and judicially noticeable "not for their truth but merely for the fact they were published" or took place. *Shive-Ayala v. Pacelle*, No. 21-704 (RJL), 2022 WL 782412, at *2 n.1 (D.D.C. Mar. 15, 2022) (citation omitted).

As Shapley would later explain to Congress, by early 2022, he and other IRS agents had recommended felony tax charges against Hunter Biden. (Ex. 1, at 23-24, 42-43 & Ex. 2 (pp. 44-46 of Ex. 1 pdf).) As 2022 progressed, Shapley grew increasingly frustrated that the Justice Department was not moving fast enough to seek the indictment he believed should be brought. He suspected the Department of "slow-walking" the case to trigger the "pause" that would be "mandated" by Department policy as they got closer to the 2022 midterm elections. (Ex. 1 at 12, 27.) When one of the prosecutors told Shapley in September 2022 that "we wouldn't be taking any actions until after the midterm elections," Shapley concluded that the Justice Department was trying to "conceal from the public the results of the investigation." (*Id*. at 27.)

Two weeks later, on October 6, 2022, the *Washington Post* published a story reflecting the first of what would become a cascade of leaks and other improper disclosures about the ongoing investigation. The article, relying on unnamed federal "agents" as sources, begins: "Federal agents investigating President Biden's son Hunter have gathered what they believe is sufficient evidence to charge him with tax crimes and a false statement related to a gun purchase, according to people familiar with the case." (Ex. 3.) The *Post* story included a press statement from Biden's then-attorney, Christopher Clark, expressing dismay at the leak: "It is a federal felony for a federal agent to leak information about a Grand Jury investigation such as this one . . . . Any agent you cite as a source in your article *apparently has committed such a felony*. We expect the Department of Justice will diligently investigate and prosecute such bad actors. . . . It is regrettable that law enforcement agents *appear to be violating the law* to prejudice a case against a person who is a target . . . ." (*Id*. at 2 (emphases added).) But the *Post* story would only be the first of many unlawful disclosures of the inner workings of the Biden investigation.

### C.    Shapley's Lawyer Engages with Congress and the Media

On April 19, 2023, Shapley's attorney, Mark Lytle, wrote a letter to the House Ways and Means Committee stating that he represented a then-unnamed IRS "whistleblower" in a "high profile" investigation who wanted to explain to Congress how the investigation's subject since 2020 had been receiving "preferential treatment" based on being "politically connected." (Ex. 4, at 1-2.) The letter was sent to the media the same day it was written (*see*, *e.g.*, Ex. 5 (*Washington Post* article)), and Lytle immediately went on a press offensive that made clear to the public that his anonymous client's alleged grievances concerned the Hunter Biden case.

On April 19, 2023 (again, the date of the letter), Lytle appeared on a conservative podcast, *Jon Solomon Reports*, to discuss alleged "political interference" in an investigation that he claimed he could not identify. (Ex. 6, 7.) But the episode's title did not mince words: "Exclusive: Lawyer for IRS Whistleblower *in Hunter Biden case* breaks silence." (Ex. 6 (emphasis added).) And, when Lytle was introduced, there was no mystery about the investigation at issue: "[T]here is a new whistleblower raising concerns about political interference in *the Hunter Biden investigation*. We're very lucky to be joined right now by the lawyer for that whistleblower." (Ex. 7, at 3 (emphasis added).) Lytle did not refute the host.

On April 20, 2023, Lytle appeared on a *CBS News* broadcast claiming that a confidential investigation was "compromised because of political considerations." (Ex. 8, at 2.) Although Lytle did not identify Hunter Biden by name, CBS's reporter said that the network had "learned the investigation the whistleblower worked on is about Hunter Biden." (*Id.*)

Lytle also appeared that same day on *Fox News* for an interview with Bret Baier to repeat the same themes. (Ex. 9.) When Lytle claimed he "couldn't identify" the specific investigation, Baier replied: "[W]e have sources telling us that this has to do with Hunter Biden's investigation." (*Id.*, at 2.)  Again, Lytle did not contradict or correct Baier.

Baier then read and displayed a statement from Clark, Biden's attorney, accusing Lytle's client (Agent Shapley) of committing a crime through the unlawful disclosures:



Lytle did not respond that Clark was talking about the wrong case, but instead said that his client (Shapley) "knows that he's going to be attacked" (*id*. at 3)—yet again confirming the obvious fact that Lytle was talking about the Hunter Biden case.

Two days later, on April 21, 2023, Clark wrote a letter to the Justice Department containing what the Complaint refers to as "Defamatory Allegation A." (Compl. ¶ 20; Ex. 10.) The letter complained about "an agent from the IRS leak[ing] information to Congress and the press, apparently in violation of federal law, regarding the investigation of our client, Robert Hunter Biden," and asked that the Department inform Clark "of the steps it is going to undertake to end these pernicious leaks in a case of national interest." (*Id*.)

It is unclear what, if anything, the Justice Department did in response, but the problem only became worse—*much* worse.

**D.    After Shapley and Ziegler Are Removed from the Biden Case, Shapley Himself Goes Public**

The following month, on May 15, 2023, Shapley and Ziegler were formally removed from the Biden investigation. (Ex. 1, at 168-69; Ex. 2, at 49.) In a later filing in Biden's criminal case, a senior IRS official explained that the decision was based on "the poor relationship that had developed between Agents Shapley and Ziegler and the Department of Justice ('DOJ') prosecutors then assigned to the case (including the lack of communication between the prosecutors and Agents Shapley and Ziegler)." (Ex. 11 ¶ 3.) Shapley himself then went public.

On May 24, 2023, he participated in an "exclusive" interview with *CBS News*. (Ex. 12; Ex. 13 (accompanying written story).)  Shapley claimed that he could not "confirm" the specific investigation at issue, but, again, the CBS reporter made clear that it was the Hunter Biden investigation. (Ex. 12, at 2.) And throughout the interview, the caption depicted below Shapley made it clear that the interview was about the "Hunter Biden Probe":



In the interview, Shapley complained that there "were multiple [investigative] steps that were slow-walked . . . at the direction of the Department of Justice." (Ex. 13, at 1.) He admitted

that what "prompted him to blow the whistle" was a "charged meeting" with the Justice

Department in which his "team was effectively excluded from the investigation." (*Id*. at 3.)

### E.    Shapley and Ziegler Testify Before the House Ways and Means Committee

The House Ways and Means Committee was eager to hear about the issues that Shapley

and his lawyers teased on television. On May 26, 2023, Shapley testified for over six hours

behind closed doors about, among other things, how the Biden case was supposedly mishandled,

and the serious crimes for which he believed Biden should be charged. (Ex. 1, at 42-43.) On June

1, 2023, Ziegler testified to the Committee for over six hours, as well, and likewise provided

details about (among other things) what crimes he believed should be charged. (Ex. 2, at 33-34.)

In both interviews, Committee counsel advised at the outset that the discussion was confidential,

emphasizing the "significance of our tax privacy laws." (Ex. 1, at 6; Ex. 2, at 6.)

On June 20, 2023, the Justice Department announced Biden was charged with, and had

agreed to plead guilty to, two misdemeanor tax offenses and to enter a diversion agreement for a

felony firearm offense, in the U.S. District Court for the District of Delaware. (Ex. 14.)

On June 22, 2023, the Ways and Means Committee voted to release the transcripts of

Shapley and Ziegler's closed-door testimony—totaling 346 pages—along with the exhibits.

(Compl. ¶ 21; Ex. 15, at 105-12.)

### F.    Shapley and Ziegler Continue the Press Tour

In the following months, Shapley, his attorney Mark Lytle, and Ziegler, spoke with a

multitude of media outlets to complain that the recent charges in Delaware were not severe

enough. The chart below provides a non-exhaustive list of appearances during their press tour

(with the dates of their Congressional testimony and its publication included in the blue shaded

rows, for completeness):

| Ex(s) | Date | Appearance / Testimony |
|---|---|---|
| 7 | April 19, 2023 | John Solomon Reports, *Exclusive: Lawyer for IRS Whistleblower in Hunter Biden case breaks silence* (**Lytle**) https://tinyurl.com/ycx7scuh |
| 8 | April 20, 2023 | CBS News, *Whistleblower may come forward in Hunter Biden tax investigation* (**Lytle**) https://tinyurl.com/cvrhy9d5 |
| 9 | April 20, 2023 | Fox News, *IRS whistleblower couldn't live with himself if he stayed quiet: Attorney for whistleblower* (**Lytle**) https://tinyurl.com/5dxzm2wv |
| 12, 13 | May 24, 2023 | CBS News, *IRS whistleblower speaks: DOJ "slow-walked" tax probe said to involve Hunter Biden* (**Shapley**) https://tinyurl.com/trph3tt7 |
| 1 | May 26, 2023 | Shapley Testimony before the House Ways and Means Committee https://tinyurl.com/yc3by26d |
| 2 | June 1, 2023 | Ziegler Testimony before the House Ways and Means Committee https://tinyurl.com/mwza4xd2 |
| 15 | June 22, 2023 | Committee testimony released (Compl. ¶¶ 21-22) https://tinyurl.com/ywff5bh5 |
| 16, 17 | June 27, 2023 | CBS News, *IRS whistleblower in Hunter Biden probe says he was stopped from pursuing investigative leads into "dad" or the "big guy,"* (**Shapley**) https://tinyurl.com/4ycs8cpr |
| 18, 19 | June 28, 2023 | Fox News, *IRS whistleblower says 'most substantive felony charges were left off the table' in Hunter Biden probe* (**Shapley**) https://tinyurl.com/5d9mym4m |
| 20 | June 29, 2023 | John Solomon Reports, *The IRS Whistleblower unplugged with John Solomon* (**Shapley**) https://tinyurl.com/bdesh8wd |
| 21, 22 | July 19, 2023 | CBS News, *IRS whistleblower in Hunter Biden case says he "felt handcuffed" during 5-year investigation* (**Ziegler**) https://tinyurl.com/429dfy3z |
| 23 | July 20, 2023 | CNN, *IRS whistleblower speaks out about Hunter Biden probe* (**Ziegler**) https://tinyurl.com/5r8xen7e |
| 24 | July 20, 2023 | The Megyn Kelly Show, *IRS Whistleblowers Gary Shapley and Joseph Ziegler Recall "Disappointing" Congressional Hearing* (**Shapley and Ziegler**) https://tinyurl.com/bdeaexfv (Part 1) https://tinyurl.com/muaeh5jt (Part 2) |
| 25, 26 | July 21, 2023 | Fox News, *IRS whistleblower: 'Independent attorney' needed to fully execute Hunter Biden investigation* (**Ziegler**) https://tinyurl.com/5eudrn8j |

| Ex(s) | Date | Appearance / Testimony |
|-------|------|------------------------|
| 27 | July 21, 2023 | John Solomon Reports, *Lawyer for IRS Whistleblowers says more evidence, documents to be given to Congress in coming weeks* (**Leavitt**) https://tinyurl.com/3aefak3k |
| 28 | July 24, 2023 | John Solomon Reports, *IRS Whistleblower Ziegler: Hunter Biden's 'contradicting' statements in autobiography used to prove his tax fraud* (**Ziegler**) https://tinyurl.com/4vxfbu3h |
| 29, 30 | July 26, 2023 | Fox News, *Attorney for IRS whistleblower urges special counsel after Hunter Biden plea deal collapses* (**Lytle**) https://tinyurl.com/573w5bvs |
| 31 | July 29, 2023 | CNN, *IRS Whistleblower calls for Hunter Biden Special Counsel* (**Ziegler**) https://tinyurl.com/2adt86yt |
| 32 | July 31, 2023 | Fox News, *Archer's comments add to the evidence against Bidens: Mark Lytle* (**Lytle**) https://tinyurl.com/2suv8bh8 |
| 33 | Aug. 1, 2023 | Fox News, *Congress needs 'additional investigation' into Biden family business dealings: Gary Shapley* (**Shapley**) https://tinyurl.com/bddwuscb |
| 34 | Aug. 11, 2023 | CNN, *Gary Shapley on The Source with Kaitlan Collins* (**Shapley**) https://tinyurl.com/ykdvyvuv |
| 35 | Aug. 12, 2023 | CNN, *Whistleblower reacts to Hunter Biden Special Counsel announcement* (**Shapley**) https://tinyurl.com/2znk6zuc |

The thrust of Plaintiffs' message to the media was that the Department of Justice should have charged more severe crimes. For example, in a joint interview with Megyn Kelly, Shapley said that if Biden were not the President's son, but a "business owner on the corner, he or she wouldn't have gotten that special treatment and he probably would have been in jail already." (Ex. 24, at 3.) Ziegler told Fox News that his team had recommended felony charges, and that he thought an independent attorney should be appointed so as to "bring the proper charges, so that there can be some faith restored in our justice system." (Ex. 25, at 5.)

Plaintiffs' press tour included the publication of gratuitously salacious details of the investigation. For example, Shapley claimed in one interview that Hunter Biden wrote off as business expenses the money he paid for "prostitutes, sex club memberships, travel for the

prostitutes, hotel rooms for purported drug dealers, no show employees." (Ex. 17, at 2.) Ziegler made a similar statement in another interview, detailing how Biden allegedly wrote off as business expenses "college tuition for his children, bills for stays at a posh Hollywood hotel, payments to escorts, and no-show employees." (Ex. 22, at 3.)

And Plaintiffs displayed no restraint in going beyond their congressional testimony in their unprecedented public comments on the strength of the evidence, even while charges were pending. Ziegler, for example, told Fox News: "[W]hen you work a criminal case, there's a thing called willfulness, whether someone intentionally, with knowledge, either evaded their income taxes or filed a false return. . . .  [A]nd in this case, we provided a ton of evidence that showed willfulness." (Ex. 25, at 3.)

### G.    Hunter Biden's Lawyers Urge the Justice Department and Congress to Put a Stop to the Unlawful Disclosures

Hunter Biden's then-counsel, Christopher Clark, reacted to this behavior with the umbrage appropriate to the intolerable situation of federal agents, bound by law to secrecy, going on a media campaign to attack Clark's client and prejudice an ongoing criminal case. On June 29, 2023, Clark wrote a letter (one of several) to the Justice Department Inspector General imploring that something be done to rectify the situation. (Ex. 36.)

Plaintiffs cite Clark's letter as the source of five of the twelve "Defamatory Allegations" (B, C, D, E, and F.) Those allegations, in sum, refer to Clark's statement that it is "apparent" that Shapley is the "source of the most damaging and troubling leaks" and to accusations that Shapley and Ziegler were acting unlawfully. (Compl. ¶¶ 23-25.) For example, Clark wrote that there was "no justification . . .  for [Shapley's] disclosures of confidential grand jury and tax information on nationally televised news broadcasts or media outlets, and such disclosures are not protected by any exceptions to either Rule 6(e) or Section 6103." (Ex. 36, at 4.)

The next day, on June 30, 2023, Lowell, also representing Biden, wrote to the Chairman of the House Ways and Means Committee to detail how Committee Members had "choreographed the dissemination of incomplete half-truths, distortions, and totally unnecessary details about Mr. Biden." (Ex. 37, at 1.) This letter contains what Plaintiffs call "Defamatory Allegation G," insofar as it states that Shapley made "unauthorized" disclosures. (Compl. ¶ 26.)

Yet, one week later, on July 7, 2023, the IRS Commissioner sent an email to "all employees" (later published by the House Ways and Means Committee) that was clearly intended to convey—without explicitly mentioning Plaintiffs by name—that the spectacle Plaintiffs created was *not* the way to raise complaints. (Ex. 38.) The email explained that those wishing to "report whistleblower concerns" have various channels to do so, depending on whether the concern implicated grand jury information or not. (*Id.*, at 1.) Where grand jury information is involved, the concerns need to go through internal executive branch channels— not Congress—and importantly, the authorized channels under no circumstances included the public media. (*Id.*) But Plaintiffs kept the tour going, as the chart above shows.

On August 14, 2023, Lowell wrote U.S. Attorney David Weiss, the prosecutor in charge of the Biden investigation, to demand that Weiss detail the steps that he would take to stem the barrage of improper and prejudicial disclosures of confidential material. (Ex. 39.) The letter is alleged to contain four of the "Defamatory Allegations" (H, I, J, and K) that, in essence, all accuse Plaintiffs of violating the law. (Compl. ¶ 27.) This letter attached four previous letters on the subject, including the June 29, 2023 letter discussed above containing four other of the so-called "Defamatory Allegations." (Ex. 39 (attaching Ex. 36 as Ex. D).)

None of the above letters is alleged to have been made public at the time they were sent. Instead, on September 6, 2014, three Committee Chairs (including the Ways and Means Chair)

wrote to Lowell to demand that he produce (among many other things) all communications

between the law firms representing Hunter Biden and the Department of Justice. (Ex. 40, at 4

(Request 20).) Lowell responded on September 14, 2023 with a letter enclosing (among other

things) the correspondence containing all the "Defamatory Allegations" mentioned above. (Ex.

41.) The September 14 letter is also alleged to contain the final statement at issue, "Defamatory

Allegation L," in which Lowell complains about the Committee giving "a forum for the so-called

agents or their representative[s] to violate federal laws protecting grand jury and tax

information." (Compl. ¶ 28.)

### H.    Hunter Biden Sues the IRS Over the Unlawful Disclosures

Four days later, on September 18, 2023, Hunter Biden, represented by Lowell, filed a

civil lawsuit against the United States Internal Revenue Service over the damaging leaks,

invoking the private right of action under 26 U.S.C. § 7431 for improper disclosure of "return

information" (as defined by 26 U.S.C. § 6103) as well as violations of the Privacy Act, 5 U.S.C.

§ 552a(e)(10). (Ex. 42.) Biden later filed an Amended Complaint on February 4, 2024. (Ex. 43.)

The IRS moved to dismiss—but only in part—the Amended Complaint, arguing that

Biden failed to state a claim under the Privacy Act and failed to state any claim with respect to

allegations that were premised on statements made by Shapley and Ziegler's personal lawyers.

(Ex. 44.) Notably, the IRS chose *not* to advance the argument that is the foundation of this case:

that the publication of Shapley and Ziegler's closed-door testimony created all-purpose

immunity for them to go on a media blitz to discuss the case.

Shapley and Ziegler attempted to intervene in the case, but Judge Contreras denied the

motion because allowing them to do so "would risk confusion of the issues and prejudice the

current parties to the case." *Biden v. U.S. Internal Revenue Serv.*, No. 23-2711, 2024 WL

4332072, at *13 (D.D.C. Sept. 27, 2024). Judge Contreras granted the IRS' partial motion to

- 16 -

dismiss only to the extent of dismissing the claims under the Privacy Act, and so the core

claim—that the IRS is liable for damages based on Shapley and Ziegler having unlawfully

disclosed "return information" protected by § 6103—is proceeding. *Id*. at *4-10.

### I.    Plaintiffs Claim Credit for the Justice Department Bringing New, Felony Charges Against Hunter Biden

By August 2023, the original, contemplated plea agreement in Delaware fell apart, for

reasons that are hotly contested but not germane to this motion.

On December 7, 2023, the Justice Department filed nine tax charges against Biden in the

Central District of California, this time including three felony tax charges. (Ex. 45.)

Plaintiffs immediately issued a public, joint statement to media outlets, claiming

"complete vindication." (Ex. 46.) The Complaint echoes Plaintiffs' taking credit for the Justice

Department ratcheting up the charges, claiming that Plaintiffs' "efforts resulted in a new level of

attention that led to [the new] criminal charges." (Compl. ¶ 13.)

### J.    Plaintiffs File Suit

On September 13, 2024 (one day before the expiration of the statute of limitations),

Plaintiffs filed this lawsuit. (Compl.) The Complaint contains one cause of action for each

Plaintiff, in each case based on the "Defamatory Allegations" discussed above. (*Id*. ¶¶ 30-49.)

### STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quotation marks omitted). "A pleading that offers labels and conclusions or a

formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]

devoid of further factual enhancement." *Id.* (quotation marks omitted). In addition, a court is "not

bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quotation marks omitted). Rather, there must be "well-pleaded factual allegations." *Id.* at 679.

Defamation claims are given particular scrutiny: "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth," courts should "expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017).

# ARGUMENT

## I.    The Challenged Statements Are Nonactionable Legal Opinions, Not Provably False Statements of Fact

The Complaint fails to state a claim because it does not allege that Lowell made false *factual* statements about Plaintiffs, but instead focuses on nonactionable statements of Lowell's legal *opinion* that Plaintiffs' traveling public relations roadshow about their work on the Hunter Biden investigation—the facts of which are not disputed—was unlawful. To be sure, Lowell's view of Plaintiffs' criminality is a well-founded one (*see* § II, *infra*), and he maintains that Plaintiffs should be held accountable for their conduct. Lowell will not be cowed from saying so by this lawsuit. But the question for the Court is not whether Lowell is correct about his reading of the grand jury rules or the tax secrecy laws. The question for the Court is a far simpler one: Are Lowell's assertions actionable as defamation? The answer is clearly no.

"[S]tatements of opinion can be actionable" as defamation only "if they imply a provably false fact, or rely upon stated facts that are provably false." *Moldea v. New York Times Co.*, 22 F.3d 310, 313 (D.C. Cir. 1994). In other words, a speaker is free to express a "subjective view, an interpretation, [or] a theory" about another person, *Houlahan v. Freeman Wall Aiello*, 15 F. Supp. 3d 77, 83 (D.D.C. 2014), so long as the speaker does not "impl[y] the allegation of undisclosed defamatory facts." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 625

(D.C. Cir. 2023) (quoting Restatement (Second) of Torts § 566 (Oct. 2022 update)). Whether allegedly defamatory statements meet these standards "is a question of law for the court," which must examine the challenged statements "in the context of the entire document in which they appear." *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 46 (D.D.C. 2022) (citations omitted).

In *Florio*, a university president issued a statement referring to a sorority as the "face of systemic racism" on campus after a picture surfaced on social media of members seemingly making a Nazi salute. *Id.* The court ruled as a matter of law that the statement expressed a nonactionable "subjective view" of "the fallout from the reappearance of the salute photo." *Id*. True, there were "facts undergirding" the statement—namely "that the salute photo was circulated and depicts [the sorority] members"—but those facts were "undisputed." *Id*.

Here, Plaintiffs fail to allege any provably false defamatory facts. The Complaint does not point to anywhere in the supposedly defamatory correspondence where Lowell quoted Plaintiffs as saying something they never said or accused them of doing something they never did.[2] One of Lowell's letters, for example, details *eight* media appearances in which Plaintiffs, in

---

[2] The Complaint describes the "defamatory message" of *all* the alleged "Defamatory Allegations" as Plaintiffs having "violated the law" (Compl. ¶¶ 31, 41), but Defamatory Allegation D could potentially be read to address a slightly different issue. The allegation is that Biden's then-attorney Clark wrote a letter to the Justice Department's Inspector General "falsely" stating the following: "[I]t is now apparent that IRS Supervisory Special Agent Gary Shapley is the source of at least many of the most damaging and troubling leaks." (*Id*. ¶ 24; Ex. 36, at 3.) To the extent Shapley is contending that he was not, in fact, the "source" for the leaks described in the letter, it is clear in context that Clark is expressing a protected opinion based on known facts, not claiming to have independent knowledge that Shapley was an unnamed source for any particular story. The next sentence in the letter talks about the curious timing whereby Shapley's lawyer sent a letter to Congress that was "presented to news outlets the same day," and followed shortly thereafter by Shapley's own public appearances. (*Id*. at 3-4.) That Clark described Shapley as the "apparent" source of the leaks only reinforces that Clark was expressing a protected opinion. *See Florio*, 619 F. Supp. 3d at 47 ("Words like 'resemble' and 'apparent'… 'qualify as language of 'apparency,' which militates in favor of treating these statements as opinion.") (quoting *Ollman v. Evans*, 750 F.2d 970, 985-86 n.31 (D.C. Cir. 1984) (en banc)).

sum, "discussed the Government's investigation of Mr. Biden, the supposed guilt or innocence of [Lowell's] client, and specific line-items of [Biden's] tax returns." (Ex. 39, at 8.) Plaintiffs do not deny *any* of the behavior Lowell describes. They cannot because it is undisputed that they did all that. Instead, Plaintiffs focus their claims on Lowell having *characterized* what they indisputably did—the massive press tour—as *illegal*. That is, the alleged defamation consists of Lowell having "accused the Plaintiffs of violating grand jury secrecy rules (Rule 6(e)) and the taxpayer confidentiality statute (26 U.S.C. § 6103)," thereby conveying the "defamatory message that [Plaintiffs] violated the law." (Compl ¶¶ 17, 31, 41.)

The fatal legal flaw to Plaintiffs' Complaint is that Lowell's view as to the legality of their conduct is not a provably false factual statement, but a legal *opinion* based on facts that Lowell details in his letters and that Plaintiffs do not and cannot contest. Plaintiffs are free to disagree with the legal conclusions Lowell draws from those facts, but that discussion belongs in the public square, not a defamation lawsuit intended as a tactical maneuver to silence one side.

That is why cases like Plaintiffs' are routinely dismissed. Courts across the country agree that the "correctness of a party's opinion on an undecided legal issue . . . is not an appropriate basis for a defamation" claim. *Hellmuth v. Efficiency Energy, L.L.C.*, No. CV H-14-2945, 2016 WL 642352, at *3 (S.D. Tex. Feb. 18, 2016). Thus, for example:

- It is not defamatory to accuse a company of unlawfully operating as an unlicensed escrow agent, where the dispute was not about whether the company had a license (it did not) but whether "California's [licensing] statute applied to the activities of" the company. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732 (9th Cir. 1999).

- It is not defamatory to describe a video of a police encounter on social media as showing a "violation of civil rights" because whether someone's rights were violated is "not a fact, but rather a legal conclusion based on a cluster of facts." *Perez v. Weaver*, No. 6:22-CV-127, 2022 WL 22863218, at *4 (E.D. Ky. Dec. 14, 2022), *report adopted*, 2023 WL 11897158 (E.D. Ky. Apr. 21, 2023).

- It is not defamatory for a lawyer to send a letter to the buyer in a merger claiming that a client had a lien on certain of the target's assets, allegedly to disrupt the sale, because the letter was a "a statement of opinion based on disclosed facts." *Pitt Chem. & Sanitary Supply Holding Co., Inc. v. Generational Equity, LLC*, No. 1839 WDA 2012, 2013 WL 11247583, at *2-3 (Pa. Super. Dec. 24, 2013). In *Pitt*, the lien was later adjudicated invalid, but that did not change the outcome. As the court noted: "Lawyers would be sued every day for defamation if they took a legal position that was later found to be incorrect." *Id*. at *3.

*See also*, *e.g.*, *Rodriguez v. Panayiotou*, 314 F.3d 979, 986 (9th Cir. 2002) (defendant's "allegations of entrapment cannot constitute defamation" because they are "opinion statements, not statements of fact"); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1999) ("Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed."); *Dial A Car, Inc. v. Transp., Inc*., 884 F. Supp. 584, 592 (D.D.C. 1995) ("At this point, all that can be said is that defendants were expressing an opinion on an inconclusive question of law and were not making representations of verifiable or 'hard definable facts.'").

The rule could not possibly be otherwise. Public discourse is filled with debates about whether the conduct of government officials is unlawful: Was the Obama administration's drone

strike program legal? Did President Trump engage in insurrection within the meaning of the Constitution on January 6, 2021? And sometimes, as here, public discourse veers into legal questions about whether certain conduct is criminal or should be pursued. For example, last year, 40 lawmakers wrote a letter urging the Justice Department to prosecute companies providing abortion medications by mail. (Ex. 47.) The authors wrote that distributing abortion medication is "not only dangerous and unsafe, it is criminal," citing the Comstock Act and RICO. (*Id*. at 4.) As another example, revelations that Hillary Clinton used a private e-mail server while Secretary of State triggered no shortage of opinion pieces detailing why her conduct was criminal and why she should be prosecuted. *See*, *e.g*., Ken Bell, *A 'reasonable' case for charging Hillary Clinton*, Miami Herald (July 11, 2016) (Ex. 48); Matthew Whitaker, *I would indict Hillary Clinton: Opposing view*, USA Today (July 5, 2016) (Ex. 49). This discourse is possible because citizens are free to make these sorts of accusations—as serious as they are—without fear of a ruinous civil judgment if they are sued and a judge disagrees with their legal analysis. Plaintiffs' Complaint flies in the face of these basic principles, and should be dismissed.

## II.    The Court Need Not Assess the "Truth" of Lowell's Opinion That Plaintiffs' Conduct Was Unlawful, But, In All Events, Lowell's Opinion Is Well-Founded

The Complaint alleges that all twelve "Defamatory Allegations" convey a singular "false and defamatory message": that Plaintiffs "violated the law." (Compl. ¶¶ 31, 41.) Thus, Plaintiffs' case hinges entirely on the assertion that they acted lawfully. But the Court need not resolve that issue because, as discussed, the lawfulness of Plaintiffs' conduct is not a "factual" matter but an opinion about which Plaintiffs and Lowell are free to disagree. To the extent the Court is nonetheless inclined to reach the merits—and there is no need to do so—the better-supported view is that Plaintiffs *did* break the law, which means that the foundation of this case falls away.

The information Plaintiffs disclosed easily falls within the broad coverage for information protected by 26 U.S.C. § 6103 and Rule 6(e). (*See* Background § A, *supra*.) Notably, Plaintiffs do not contend otherwise. Instead, Plaintiffs contend that it is "not a violation of any rule or law for Plaintiffs to discuss information that others lawfully disclosed to the public domain." (Compl. ¶ 29.) In other words, because the Ways and Means Committee chose to publicize the transcripts of Plaintiffs' closed-door testimony, the theory goes, Plaintiffs were free to "discuss [that] information" with as many media outlets as they like. (*Id*.)

The immediate problem with Plaintiffs' position is that the media blitz began *before* the closed-door testimony occurred or was publicly released, including appearances by Shapley's then-counsel Mark Lytle, and an interview Shapley gave to *CBS News*. (*See* Exs. 6-9, 12-13.) The Committee's later publication of Shapley's transcript cannot reach back in time and immunize the blatant illegality of interviews which Shapley (or his counsel as agent) had given weeks or months before.[3]

Shapley may contend he and Lytle did not utter Hunter Biden's name in the interviews that occurred before the Committee's release of the transcripts, but that was a transparent ruse. As discussed, each public report made plain to viewers and readers that the subject of discussion was Hunter Biden—with the obvious acquiescence of Shapley and Lytle. It is absurd to think that any of the reports would have been newsworthy enough to broadcast or publish if Shapley and his lawyer were talking about an unknown taxpayer, as opposed to the President's son.

---

[3] Shapley cannot escape responsibility for statements made by his lawyer, Lytle. In Hunter Biden's civil suit against the IRS, Judge Contreras correctly ruled that Lytle's statements are attributable to Shapley under basic agency principles, and added that it would "defeat [the] statutory scheme" to rule otherwise: "Interpreting the statutory scheme to allow for repeated disclosures by an agent working at the direction of a federal employee would tend to defeat that statutory scheme and undermine Congress's mandate that the federal government take its confidentiality obligations seriously." *Biden*, 2024 WL 4332072, at *5-8.

Regardless, the Supreme Court has squarely held that merely omitting the taxpayer's name and other identifying information from a disclosure about a tax return does "*not* deprive it of protection under § 6103(b)." *Church of Scientology of Cal. v. Internal Revenue Serv.*, 484 U.S. 9, 18 (1987) (emphasis added). After all, § 6103 "contains an elaborate description of the sorts of information related to returns [that are] compelled to keep confidential," and if Congress thought that merely anonymizing the information would erase all protection, the law "could have been prefaced by the simple instruction" to that effect. *Id.* at 15. In the context of Rule 6(e), we have been unable to find case law precisely addressing whether merely anonymizing disclosures renders them lawful, but the logic behind the *Scientology* decision suggests not. If the drafters of the Federal Rules of Criminal Procedure intended to allow grand jury material to be released so long as identifying information were hidden, the Rule would simply say that—but it does not. *Accord Fund for Const. Gov't v. Nat'l Archives & Records Serv.*, 485 F. Supp. 1, 12 (D.D.C. 1978) (concluding, in the context of a FOIA case, that the "proper scope of the deletions made pursuant to . . . Rule 6(e) is broad, applying to all matters occurring before a grand jury").

As for the media appearances occurring *after* the publication of their closed-door testimony, it is important to understand that Plaintiffs made media disclosures *beyond* their Committee testimony, and so Plaintiffs' "public domain" theory fails even on its own terms. For instance, as discussed, Ziegler revealed internal deliberations when he told Fox News—while the indictment was outstanding—that his team "provided a ton of evidence that showed willfulness." (Ex. 25, at 3.) He did not make any comment along those lines in his closed-door testimony. (Ex. 2; *see also* Ex. 43 ¶ 9 (additional examples in Hunter Biden's suit against the IRS).)

More fundamentally, Plaintiffs are simply wrong to assert that the Committee's publication magically erases the protections of § 6103 or Rule 6(e).

With respect to § 6103, at least four federal Courts of Appeals (the Fourth, Fifth, Seventh, and Tenth Circuits) have squarely held that "§ 6103's protection does not disappear simply because tax return information has been disclosed in the public record." *Johnson v. Sawyer*, 120 F.3d 1307, 1323 (5th Cir. 1997); *see also Mallas v. United States*, 993 F.2d 1111, 1120-21 (4th Cir. 1993); *Thomas v. United States*, 890 F.2d 18, 21 (7th Cir. 1989); *Rodgers v. Hyatt*, 697 F.2d 899, 906 (10th Cir. 1983). To be sure, the Ninth Circuit has adopted the contrary rule, *Lampert v. United States*, 854 F.2d 335, 338 (9th Cir. 1988), and the Sixth Circuit has held that § 6103 does not apply when the government "republishes" public information "for tax administration purposes" (in that case, to foreclose on a tax lien). *Rowley v. United States*, 76 F.3d 796, 802 (6th Cir. 1996). But Plaintiffs' media blitz has nothing to do with "tax administration" and, so, Plaintiffs are on the wrong side of a 4-1-1 Circuit split.[4]

The majority position is easily the better view of the law.

First, "the plain text of § 6103 contains no express exceptions permitting disclosure of tax return information that has arguably lost its confidentiality." *Johnson*, 120 F.3d at 1319; *see also Mallas*, 993 F.2d at 1120 (declining to "usurp the legislative function by adding a judicially created exception to those set forth by Congress" in the statutory text).

---

[4] The Seventh Circuit and Fifth Circuit have added a gloss that does not help Plaintiffs, holding that § 6103 is not violated "when the immediate source is a public document lawfully prepared by an agency that is separate from" the IRS. *Thomas*, 890. F.2d at 22; *see also Johnson*, 130 F.3d at 1318 (approving "the Seventh Circuit's 'source' analysis" in *Thomas*). In *Thomas*, the Seventh Circuit held that the IRS could publicize information taken directly from an opinion of the Tax Court, but was careful to distinguish "publiciz[ing] the opinion itself" from conduct not sourced directly to the opinion—such as "publiciz[ing] so much of the information found [in the IRS's files] as had been disclosed in the opinion" or otherwise using the opinion to "launder[]" protected information. 890 F.2d at 20-21. The Seventh Circuit rejected the notion that "every item of information contained in a public document is known to the whole world" and thereby categorically free from further protection. *Id.* at 21. Here, Shapley and Ziegler did not merely republish the transcripts the Ways and Means Committee had released, but went on a media tour to reveal, discuss, and amplify the investigative facts and Plaintiffs' assessment of those facts.

Second, there is powerful evidence that the absence of a "public domain" exception was deliberate. Another portion of the statute states that, when the IRS shares data with other agencies, the statutory data security requirements "shall cease to apply" to information "made a part of the public record" in a court or administrative proceeding. 26 U.S.C. § 6103(f)(iii). It is thus clear that the enacting Congress contemplated the scenario of confidential information later becoming public, and knew how to draft language allowing for such information to be treated differently—but chose not to do so when defining "return information." *See Johnson*, 130 F.3d at 1321 (the absence of a "public record" exception could not have been "unintentional").

Third, Plaintiffs' position rests on the fiction that confidentiality is an all-or-nothing proposition—*i.e.*, that once information is disclosed in any domain whatsoever, the affected "individual has no interest in limiting disclosure or dissemination of the information" any further. *Mallas*, 993 F.2d at 1120 (quotations and citation omitted); *see also Johnson*, 120 F.3d at 1323 n.3 (rejecting the "legal fiction" that only "secrets can be confidences") (citation omitted). But that is not how confidentiality works in the real world. And it does violence to the privacy interests behind § 6103 for government officials, duty-bound to secrecy, to amplify the disclosure of private information or to verify that an earlier disclosure was correct via the sort of media blitz that occurred here. The Congress that enacted § 6103, concerned about executive branch officials using private information for political gain, could not have possibly intended to allow officials to circumvent the statutory strictures by "'laundering' confidential information" through pretextual channels so the information could be publicized more widely. *Thomas*, 890 F.2d at 21. Yet that describes exactly Plaintiffs' decision to partner with Congressional allies to create a political circus around the Hunter Biden case.

A similar analysis applies to grand jury information. As with § 6103, Rule 6(e) "does not create a type of secrecy which is waived once public disclosure occurs." *In re North*, 16 F.3d 1234, 1245 (D.C. Cir. 1994) (citation omitted). Thus, government officials are generally "obligated to stand silent" and heed their "pre-existing bond of secrecy," even where there has been some public disclosure of grand jury information. *Id*. To be sure, there comes a point "when information is sufficiently widely known that it has lost its character as Rule 6(e) material," *id*., but "this exception is, and should be, applied sparingly." 1 Wright & Miller, Federal Practice & Procedure Criminal § 107 (5th ed. 2023). And it would turn the principle of grand jury secrecy on its head to allow Plaintiffs to escape the secrecy obligations in Rule 6(e) because they decided to unleash a publicity campaign to apply political pressure to the Hunter Biden case. Just as "a prosecutor is not free to leak grand jury material and then make a self-serving claim that the matter is no longer secret," *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1004 n.13 (D.C. Cir. 1999), it is doubtful that a court would allow Plaintiffs to "make a self-serving claim" that the Hunter Biden case is "no longer secret" because of publicity that Plaintiffs themselves set in motion. We have found no case where a court found a government official's own choice to disclose grand jury information justified even more disclosure.

In sum, the lynchpin of Plaintiffs' case—that the public disclosure of their Congressional testimony rendered their media tour lawful and rendered false Lowell's accusations of illegality—is baseless. There was and is every reason for Lowell to conclude that Plaintiffs *did* act criminally, and Lowell has every right to continue saying so.

## III.    Plaintiffs Fail to Plead Facts Showing Actual Malice

A still further ground to dismiss the case is that Plaintiffs have not sufficiently pleaded "actual malice." To encourage uninhibited debate on issues of public concern, the First Amendment applies the exacting "actual malice" standard to claims of defamation brought by

public figures, including so-called "limited-purpose" public figures who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Jankovic v. Int'l Crisis Group*, 822 F.3d 576, 584 (D.C. Cir. 2016).  By "enter[ing] voluntarily into one of the submarkets of ideas and opinions," limited-purpose public figures are deemed to "invite public criticism and rebuttal" and to consent to the "rough competition of the marketplace." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996).

The Complaint seemingly concedes that Plaintiffs are limited-purpose public figures because Plaintiffs allege that the Complaint satisfies the "actual malice" standard. (Compl. ¶ 29.) Regardless, it would be difficult for Plaintiffs to contend otherwise, since they plainly "thrust themselves" into a public controversy. *Jankovic*, 822 F.3d at 584. As self-described "whistleblowers," Plaintiffs engendered a media frenzy with the obvious purpose of influencing the Hunter Biden case and the public's assessment of it. Far from denying any role in the public debate, Plaintiffs boast in their Complaint that their publicity campaign "resulted in a new level of attention that led to [the new, felony] criminal charges." (Compl. ¶ 13.) Having admittedly played a major role in the highly-publicized case, it is only fair that Plaintiffs should expect corresponding scrutiny that is part and parcel of public engagement on controversial issues. *See*, *e.g.*, *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 708-11 (4th Cir. 1991) (en banc) (holding that scientist and "self-styled whistleblower" was a limited-purpose public figure because he engaged with government officials to highlight research showing that a pesticide was unsafe).

The upshot is that Plaintiffs are subject to the heightened requirement to plead facts plausibly showing "actual malice," *i.e.*, "that the defendant published the defamatory falsehood with . . .  'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting

*New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). Cases routinely fail this "daunting" standard, *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), and are dismissed. *See, e.g.*, *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84 (D.D.C. 2019); *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 149 (D.D.C. 2017); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 144 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017).

Importantly, the pleading standard requires *facts,* not formulaic recitation of labels and conclusions. Simply alleging, as done here, that a defendant "knew that the statements" at issue were false will not do. *Arpaio*, 404 F. Supp. at 84. Courts instead look for factual allegations plausibly supporting a conclusion about the defendant's knowledge, such as facts demonstrating the alleged defamatory statements were "(1) fabricated; (2) so inherently improbable that only a reckless person would have put [them] in circulation; or (3) based wholly on . . . [a] source that [plaintiff] has obvious reasons to doubt." *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218 (D.D.C. 2012) (alterations added; citation omitted). Yet nothing like that is alleged here. There are *no facts* pled or that could be pled tending to show that Lowell acted with actual malice. Plaintiffs' actual malice allegations consist *solely* of the following paragraph (*see* Compl. ¶ 29):[5]

> Lowell knew each of the Defamatory Allegations A-L were both expressly and implicitly false. He knew that whistleblower disclosures of otherwise confidential tax information to the tax committees in Congress is expressly authorized and permitted by 26 U.S.C. § 6103(f)(5). He knew that it was not a violation of any rule or law for Plaintiffs to discuss information that others lawfully disclosed to the public domain. He knew that Plaintiffs did not release any information that was not already in the public domain.

---

[5] The word "malice" (or derivations) appears in other parts of the Complaint—*e.g.*, Lowell is accused of harboring the "malicious intent" to inflict "reputational harm" on Plaintiffs (Compl. ¶ 18)—but these allegations refer to ill-will, not to the term of art "actual malice" under defamation doctrine. *See Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 264 n.3 (D.D.C. 2017) (explaining that "in defamation cases, 'actual malice' is a term of art that focuses on what the defendant knew about the veracity of the statements, and should not be confused with . . . ill will or 'malice' in the ordinary sense of the term") (quotations and citation omitted).

> And he knew that people in Plaintiffs' professional and personal
> community would understand his Defamatory Allegations to mean
> that Plaintiffs had released non-public information that was
> protected by rule and statute. Lowell, thus, acted with actual
> malice in making the Defamatory Allegations.

Missing from this paragraph is a single fact behind the conclusory assertions about what Lowell supposedly "knew." Consider, for instance, the allegation that Lowell "knew that it was not a violation of any rule or law for Plaintiffs to discuss information that others lawfully disclosed to the public domain." Setting aside how one can "know" a highly contestable legal proposition, what facts demonstrate that Lowell secretly agrees with Plaintiffs' misguided view of the law? Did Lowell say or do anything inconsistent with the assertions in his correspondence? Plaintiffs simply fail to set forth facts plausibly supporting the notion that Lowell "knew" the letters were "false" (again, a strange label for a legal proposition).

The far more plausible inference is that Lowell accused Plaintiffs of breaking the law because, as discussed, there are ample grounds for believing that Plaintiffs acted in a flagrantly unlawful way. Lowell was not alone in that view. From the beginning of Plaintiffs' publicity campaign, Lowell's predecessor, Christopher Clark, was calling out the criminality of the leaks (*e.g.*, Ex. 3, at 2) not because he, too, was recklessly making up a phony allegation, but because Plaintiffs engaged in grievous illegality that was harmful to Clark's (and Lowell's) client. Any good defense lawyer would have called out their outrageous and illegal conduct.

And Lowell has gone further. As mentioned, Lowell is representing Biden in a civil suit against the IRS premised on the allegation that Plaintiffs *did* violate § 6103 by disclosing Biden's confidential "return information." (Ex. 42.) Whether that case ultimately succeeds or not—it has survived a motion to dismiss—Plaintiffs' Complaint supplies *zero* reason to think Lowell chose to file a case resting on a legal foundation that he secretly "knows" is "false."

In short, Plaintiffs' actual malice allegations are not only lacking but totally implausible, and so, on this independent basis, the Complaint must be dismissed.

## IV.    The "Legislative Privilege" Bars Plaintiffs' Claims

A final, independent ground for dismissal is that the alleged "Defamatory Allegations" are categorically protected by the privilege for communications with a legislative body.

Under the "legislative privilege," a "witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding." *Webster v. Sun Co., Inc.*, 731 F.2d 1, 4 (D.C. Cir. 1984) (quoting Restatement (Second) of Torts § 590A (1977)). The privilege ensures that those supplying information to a legislative body give "full disclosure" and are not "hampered by fear of private suits for defamation." Restatement (Second) of Torts § 588 cmt. a (1977) (discussing judicial privilege); *id.* § 590A cmt. a (1977) (stating that judicial and legislative privilege are "similar in all respects" and incorporating by reference comments to § 588)). For the privilege to apply, the information "need not be material or relevant to the issues" at hand, so long as it has "some reference to the subject of" the inquiry. Restatement (Second) of Torts § 588 cmt. c (1977).

The D.C. Circuit's decision in *Langeman v. Garland*, 88 F.4th 289 (D.C. Cir. 2023) reflects a paradigm example of the privilege: FBI director Christopher Wray testified during a Senate hearing that a former FBI agent mishandled a particular investigation, and the Court found Wray immune from any defamation claim arising from that testimony. *Id*. at 296-97; *see also*, *e.g., Banks v. Kramer*, 603 F. Supp. 2d 3, 11 (D.D.C. 2009) (judge's testimony before Senate Committee on Governmental Affairs that she was unaware of any complaints against her was related to congressional proceeding and thus privileged).

- 31 -

The privilege is not limited to oral testimony at live hearings but also extends to written communications sufficiently connected to the functions of a legislative body.  In *Webster v. Sun Co., Inc*., 790 F.2d 157 (D.C. Cir. 1986), for example, a lobbyist for a car company forwarded to the Congressional Research Service a memorandum that was critical of the inventor of a particular device designed to improve fuel efficiency, and the D.C. Circuit upheld the District Court's finding that the communication was privileged. *Id*. at 158-61; *see also*, *e.g.*, *Imperial v. Drapeau*, 716 A.2d 244, 245-52 (Md. 1998) (applying privilege to letter from physician to member of Congress calling for an investigation of an emergency medical technician who mishandled the transport of a patient); *DeSantis v. Employees Passaic Cnty. Welfare Ass'n*, 568 A.2d 565, 566-69 (N.J. Super. Ct. App. Div. 1990) (applying privilege to letter from labor organization to county advisory committee alleging misconduct by county official).

The facts here fit easily into the legislative privilege. The Complaint alleges that the "Defamatory Allegations" were "published" by the September 14, 2023 letter that Lowell sent to three Committee Chairs in Congress. (Compl. ¶¶ 17-28.) The letter contains all twelve "Defamatory Allegations," one in the letter itself and the others in letters that were enclosed. (Compl. ¶¶ 17-29.) Hence, every "publication" at issue was a communication to Congress.[6]

Further, there can be no serious dispute that the letter has "some reference to the subject of" the Congressional inquiry, because the Committee chairs *specifically requested* Lowell to produce all communications between the law firms representing Hunter Biden and the Department of Justice. (Ex. 40, at 4 (Request 20).) *Accord* Restatement (Second) of Torts § 588

---

[6] Plaintiffs focus on this particular act of "publication" because they clearly recognize that the District of Columbia's one-year statute of limitations, *see* D.C. Code § 12–301(a)(4), would bar any claim based on the original transmittals of the letters enclosed with Lowell's September 14, 2023 correspondence to Congress.

cmt. c (1977) (in the context of privilege for judicial proceedings, explaining that "[i]f the defamatory matter is published in response to a question put to the witness," then it is "within the protection of the privilege"). It would wholly undermine the purpose of the privilege—encouraging full disclosure—to impose liability upon Lowell for dutifully *complying* with a Congressional document request.[7]

## CONCLUSION

For the reasons stated, the Court should dismiss the Complaint with prejudice.

Dated: November 18, 2024

STEPTOE LLP

By: */s/ Michael E. Stoll*
    Michael E. Stoll
    Jason M. Weinstein*
    1330 Connecticut Avenue, NW
    Washington, D.C. 20036
    (202) 429-3000
    mstoll@steptoe.com
    jweinstein@steptoe.com

    Charles Michael*
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    cmichael@steptoe.com

    **pro hac vice* application pending

    *Counsel for Defendant Abbe Lowell*

---

[7] Although the Complaint vaguely alleges that Lowell made a further publication of his letter "to the media" (Compl. ¶ 19), defamation claims must "specify the person or persons to whom the statements were made or published." *Vreven v. Am. Ass'n of Retired Persons*, 604 F. Supp. 2d 9, 15 (D.D.C. 2009) (citations omitted). Referring to a vague category of listeners will not do, which is why the court in *Vreven* dismissed an AARP employee's claim that she "was defamed to unnamed AARP employees . . . in the building in which she worked." *Id*. at 16. The "media" is an even larger and vaguer category of listeners than employees of one AARP office, and therefore Plaintiffs' vague allegation about publication to "the media" cannot rescue their claim. *See also Hoffman v. Hill & Knowlton, Inc*., 777 F. Supp. 1003, 1005 (D.D.C. 1991) (alleging that a company disseminated a "false reason for demanding [plaintiff's] resignation to its employees and to potential employers" did not sufficiently specify the audience).