**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GARY SHAPLEY and

JOSEPH ZIEGLER,

                Plaintiffs,

      —*against*—

ABBE LOWELL,

                Defendant.

1:24-cv-02646-RJL

**DEFENDANT ABBE LOWELL'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF HIS MOTION TO DISMISS**

STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036
(202) 429-3000

January 17, 2025

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

I.    The Challenged Statements Are Nonactionable Opinions........................................4

    A.    The Challenged Statements Do Not Assert Objectively Verifiable Facts ................................................................................ 4

    B.    The Challenged Statements Do Not Imply Undisclosed Facts ................. 5

    C.    Lowell Was Not Required to "Hedge" or Moderate His Opinions ................................................................................ 8

II.    Plaintiffs' "Second Basis" for Defamation Is Baseless ................................ 11

    A.    The Challenged Statements Say Nothing About Plaintiffs' Media Tour Disclosing New Information ................................ 11

    B.    Regardless, Plaintiffs Disclosed New Information to the Media ................................................................................ 14

III.    Plaintiffs Repeatedly Broke the Law ................................................... 16

    A.    Plaintiffs' Disclosures to Congress Violated Rule 6(e) .......................... 16

    B.    Public Disclosure Does Not Categorically Immunize Subsequent Violations ................................................ 18

IV.    Plaintiffs Fail to Plead Facts Showing Actual Malice ......................................19

V.    Plaintiffs' Republication Allegations Are Inadequate ......................................22

VI.    The Court Should Not Grant Plaintiffs Leave to Amend ......................................23

CONCLUSION........................................................................................ 25

# TABLE OF AUTHORITIES

**C**ASES

*Bancroft Glob. Dev. v. United States*,
   330 F. Supp. 3d 82 (D.D.C. 2018) ..................................................................... 19

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,
   151 F. Supp. 3d 287 (E.D.N.Y. 2015). ................................................................ 9

*Biden v. U.S. Internal Revenue Serv.*,
   2024 WL 4332072 (D.D.C. Sept. 27, 2024) .................................................... 25

*Brian v. Richardson*,
   660 N.E.2d 1126 (N.Y. 1995) ............................................................................. 9

*Church of Scientology of Cal. v. Internal Revenue Serv.*,
   484 U.S. 9 (1987) ............................................................................................. 15

*Glass v. United States*,
   480 F. Supp. 2d 162 (D.D.C. 2007) .................................................................. 18

*In re Motions of Dow Jones & Co.*,
   142 F.3d 496 (D.C. Cir. 1998) .......................................................................... 17

*In re North*,
   16 F.3d 1234 (D.C. Cir. 1994) .......................................................................... 18

*In re Sealed Case No. 99-3091*,
   192 F.3d 995 (D.C. Cir. 1999) .......................................................................... 17

*Jackson v. Denmark Tech. Coll.*,
   2018 WL 3729743 (D.S.C. Aug. 6,  2018) ....................................................... 23

*James Madison Ltd. by Hecht v. Ludwig*,
   82 F.3d 1085 (D.C. Cir. 1996) .......................................................................... 23

*Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*,
   214 F. Supp. 3d 43 (D.D.C. 2016), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017) ....... 17

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
   838 F.2d 1287 (D.C. Cir. 1988) ........................................................................ 19

*Lopez v. Dep't of Just.*,
   393 F.3d 1345 (D.C. Cir. 2005) ........................................................................ 17

*Mallas v. United States*,
   993 F.2d 1111 (4th Cir. 1993) .......................................................................... 19

*Mandawala v. Ne. Baptist Hosp.*,
    16 F.4th 1144 (5th Cir. 2021) ........................................................................ 23

*McFarlane v. Esquire Mag.*,
    74 F.3d 1296 (D.C. Cir. 1996) ...................................................................... 19

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) .................................................................................... 6, 7

*Montgomery v. Risen*,
    197 F. Supp. 3d 219 (D.D.C. 2016) ................................................................. 5

*Ollman v. Evans*,
    750 F.2d 970 (D.C. Cir. 1984) ............................................................. 4, 5, 8, 9

*PAI Corp. v. Integrated Sci. Sols., Inc.*,
    2007 WL 1229329 (N.D. Cal. Apr. 25, 2007) ................................................ 23

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ...................................................................... 11

*Pollinger v. United States*,
    539 F. Supp. 2d 242 (D.D.C. 2008) ............................................................... 18

*Price v. Viking Penguin, Inc.*,
    676 F. Supp. 1501 (D. Minn. 1988) ......................................................... 20, 21

*Punturo v. Kern*,
    2018 WL 5276142 (Mich. App. Oct. 6, 2018) .................................................. 7

*Rafferty v. Halprin*,
    1991 WL 148798 (S.D.N.Y. July 26, 1991) .................................................... 23

*Schiavone Constr. Co. v. Time, Inc.*,
    847 F.2d 1069 (3d Cir. 1988) ..................................................................... 22

*Sebastiani v. Brooklyn Hosp. Ctr.*,
    2019 WL 3281010 (E.D.N.Y. July 19, 2019) .................................................. 23

*Tavoulareas v. Piro*,
    817 F.2d 762 (D.C. Cir. 1987) ..................................................................... 21

*Vreven v. Am. Ass'n of Retired Persons*,
    604 F. Supp. 2d 9 (D.D.C. 2009) ............................................................. 22, 23

*Wade v. Wood*,
    2024 WL 1075482 (N.D. Ga. Mar. 12, 2024) .................................................. 7

*Yukos Cap. S.A.R.L. v. Feldman*,
    2016 WL 183360 (S.D.N.Y. Jan. 7, 2016) ....................................................... 23

*Zimmerman v. Al Jazeera Am., LLC*,
    246 F. Supp. 3d 257 (D.D.C. 2017) ............................................................... 20

**STATUTES**

28 U.S.C. § 2103(f) ............................................................................................... 16

26 U.S.C. § 6103 ........................................................................................... *passim*

**RULES**

Fed. R. Crim. P. 6(e) ..................................................................................... *passim*

**TREATISES**

1 Rodney A. Smolla, Law of Defamation (2d ed. 2024) ................................. 21, 22

Hon. Robert D. Sack, Sack on Defamation (5th ed. 2024) .................................. 22

RESTATEMENT (SECOND) TORTS (1977) .............................................................. 6

## INTRODUCTION

Plaintiffs Gary Shapley and Joseph Ziegler audaciously argue that defendant Abbe Lowell "destroy[ed] the[ir] reputations" merely because he called out their lawbreaking. They sanctimoniously claim to be bringing this suit so that "government servants who come after them" do not face "retribution" by "powerful" actors like Lowell. (ECF 16, at 1-2.) But this version of events is difficult to square with Plaintiff's status as welcomed media darlings who are given every opportunity to pat themselves on the back. They wrote in the *Wall Street Journal*, for example, that the "dizzying narrative shift[]" regarding the Hunter Biden case occurred only "because the two of us blew the whistle and exposed the preferential treatment the Biden Justice Department gave to a powerful political family." *See* Joseph Ziegler & Gary Shapley, *Hunter Biden's Pardon: Your Tax Dollars At Work*, THE WALL STREET JOURNAL (Dec. 3, 2024) (*see* Michael Reply Decl. Ex. A). Far from being pariahs with damaged reputations, since the filing of Lowell's motion to dismiss, Plaintiffs have continued their media tour, compounding the unlawful behavior and now trying this case in the press.[1]

The overarching flaw with their lawsuit is that Lowell has every right to view things quite differently—and to say so. What the Plaintiffs characterize as legitimate "whistleblowing" was anything but. They went on a media tour in 2023 (and continued in 2024) in which they laid bare the inner workings of the Hunter Biden criminal investigation and complained that the charges career prosecutors were prepared to bring were, in the judgment of Plaintiffs—who apparently thought they knew better—not harsh enough. This publicity tour—with over 20 interviews—was disgraceful, outside the bounds of any proper whistleblowing process, and violated the

---

[1] Since Lowell's motion to dismiss Plaintiffs have, in addition to their *Wall Street Journal* op-ed, appeared on Fox News four times and CBS News once to discuss the Biden case and this lawsuit. (*See* Michael Reply Decl. Exs. B-F.)

requirements of both 26 U.S.C. § 6103 and Federal Rule of Criminal Procedure 6(e) to protect the confidentiality of the Biden investigation. One reason these rules exist is to ensure that serious charging decisions are made within the private deliberation of the government chain of command and with sober consideration of all the evidence. Attempting to unleash a public mob with incomplete information to weigh in on how harshly to pursue a defendant is the antithesis of how law enforcement should operate. And contrary to Plaintiffs' self-righteous claim to be helping other government servants, what Plaintiffs did was a grievous insult to their fellow, law-abiding IRS agents, and highly prejudicial to Biden. While Plaintiffs, as they continue to be invited to and appear across media, preposterously complain of having their reputations "destroyed" by "powerful" opponents like Lowell, it is Plaintiffs who threaten to use the powerful weapon of the federal courts to silence Lowell. The Court should not go along. Plaintiffs' opposition papers cannot undo the glaring deficiencies in the Complaint.

*First*, the alleged defamation consists of statements in letters written by Lowell (or by another Biden attorney, Christopher Clark, whose letters Plaintiffs baldly alleged Lowell "republished") complaining to the Justice Department and others that Plaintiffs' conduct was unlawful—which is a legal opinion, not a provably false statement of fact. In arguing otherwise, Plaintiffs characterize the statements at issue as so-called "mixed" opinions that imply some factual knowledge, in the same way that the statement *I believe Jones to be a thief*, implies knowledge of something Jones *did*. But Plaintiffs never say what facts were implied. There are none. What Plaintiffs did is not disputed, and they nowhere accuse Lowell of claiming they said or did something they did not say or do. All that is disputed is how to *characterize* what Plaintiffs did, and Lowell believes—with ample justification—that Plaintiffs' conduct falls squarely within the proscriptions of § 6103 and Rule 6(e). He is free to say so.

Plaintiffs next try to suggest that Lowell's legal opinions are, in reality, more like factual statements because Lowell is a prominent attorney who expressed his opinions confidently and without "hedging" to indicate possible contrary views. But defamation law is not a straightjacket on speakers based on their prominence or based on how forcefully they express themselves. The notion that Lowell or Clark were required to write their letters in a hedging, *on-the-one-hand-on-the-other* style is especially absurd because the letters obviously represent advocacy by attorneys representing Mr. Biden's interests.

*Second*, Plaintiffs, for the first time, accuse Lowell of a separate category of defamation, insofar as he supposedly accused Plaintiffs of disclosing to the media certain information that Plaintiffs had not already disclosed in Congressional hearings. Plaintiffs think this distinction is important because, on their (incorrect) view of the law, the public release of the transcripts was license to go on a media blitz to say whatever they wanted, so long as they did not say anything new. But, crucially, the at-issue letters have nothing to do with this bogus distinction. The letters with the allegedly defamatory statements say *nothing* about whether what Plaintiffs said to the media was "new." Lowell cannot be liable for things he did not say or publish.

*Third*, Plaintiffs spend considerable space on whether § 6103 and Rule 6(e) contain the "public disclosure" exception they hypothesize. But it does not, as the vast majority of cases have concluded. This debate is ultimately beside the point because it suffices to recognize that disputes on these issues are fair game for public discourse, and do not reflect "facts" that a jury could determine once and for all to be "true" or "false."

*Fourth*, Plaintiffs cannot plead facts establishing actual malice, *i.e.*, that Lowell published his opinions on the law somehow knowing them to be "false" views. The concept of having "false" legal opinions is incoherent, but, regardless, nothing in the Complaint would suggest that

Lowell—who represents accused defendants for a living—secretly harbors a view of § 6103 or Rule 6(e) that undermines the privacy rights of those subject to criminal investigations.

*Fifth*, Plaintiffs have failed to plead facts sufficient to put Lowell on notice of to whom he supposedly "published" the statements. The Complaint refers only vaguely to Lowell publishing the letters to the "media"—an impossibly unbounded category of listeners.

*Finally*, Plaintiffs should not be granted leave to amend. Their opposition appends a chart of seven miscellaneous facts, such as the fact that two Republican Congressman apparently share Plaintiffs' view of the law, that cannot remedy the fundamental deficiencies discussed above.[2]

## I.    The Challenged Statements Are Nonactionable Opinions

### A.    The Challenged Statements Do Not Assert Objectively Verifiable Facts

As detailed in Lowell's moving papers, the singular, allegedly defamatory message at issue—that Plaintiffs' conduct was criminal—is a protected opinion, because it expresses a subjective judgment that cannot be proven "false." (ECF 11-1, at 18-20.) Plaintiffs respond by proclaiming that "Lowell's accusations are express statements of fact that are provably false." (ECF 16, at 13.) But, critically, they offer *no hint* as to how they could "prove" that Lowell's beliefs about how § 6103 and Rule 6(e) apply to Plaintiffs' conduct are factually "false."

There is no coherent way to do so, because the challenged statements do not assert verifiable facts. That is, the challenged statements do not "describe present or past conditions capable of being known through sense impressions." *Ollman v. Evans*, 750 F.2d 970, 978 (D.C.

---

[2] Plaintiffs waste the Court's time with a separate filing objecting to Lowell including judicially noticeable material, such as articles and transcripts reflecting Plaintiffs' own press appearances, in support of his motion. (ECF 16-2.) Plaintiffs nowhere suggest that *any* of the material is not genuinely what it purports to be, and do not deny having made the statements reflected in the press material. They argue instead, bizarrely, that this information is somehow not relevant to the motion to dismiss (*id*. at 1-2), when the gist of the Complaint is that Lowell falsely accused them of breaking the law through the very press appearances appended to Lowell's motion.

Cir. 1984). The statements are opinions, *i.e.*, "evaluative statements reflecting the author's political, moral, or aesthetic views"—or *legal* views—"not the author's sense perceptions." *Id.*

Here, there is no dispute about what Plaintiffs did and said. The disagreement concerns the *legal conclusions* about that conduct, which cannot be verified through anyone's "sense perceptions" or any objective, factual method. *See, e.g.*, *Montgomery v. Risen*, 197 F. Supp. 3d 219, 249–50 (D.D.C. 2016) (dismissing claim because there was "no method to objectively verify" whether plaintiff committed "one of the most elaborate and dangerous hoaxes in American history"). One can therefore only wonder how Plaintiffs propose to prove the "falsity" element of their case. Plaintiffs have demanded a jury trial (*see* ECF 1, at 11)—is the idea that a jury is going to hear opposing legal experts and decide that the testimony of one or the other is "false"?  The notion of establishing "truth" in this context simply makes no sense.

The D.C. Circuit has aptly cautioned that a threat to the First Amendment "looms large when juries attempt to assess the truth of a statement that admits of no method of verification," because, lacking any objective method to assess truth, a jury may "render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Ollman*, 750 F.2d at 981. Yet that is exactly the sort of threat occasioned by a case like this one, where Plaintiffs apparently hope to sell a jury on their self-righteous narrative of being noble public servants whose "good names" have been "smear[ed]" by a "powerful" lawyer acting "with impunity." (ECF 16, at 3, 5.) The Court should reject this effort entirely and should not open the door to a jury facing the impossible task of determining whose legal opinions are "true."

## B.    The Challenged Statements Do Not Imply Undisclosed Facts

Plaintiffs are likewise wrong in arguing that Lowell's legal opinions constitute so-called "mixed" opinions that "implied assertions of verifiable facts that were undisclosed." (ECF 16, at

13.) The immediate problem with this argument is that Plaintiffs never say what "verifiable"

defamatory facts were "implied" by Lowell's opinions. There are *none*.

      The facts surrounding Plaintiffs' media tour are a matter of public record, and Lowell did

not claim to have any knowledge of Plaintiffs' behavior beyond what the public could see on

their television sets or read on the internet. The letters at issue lay out in detail the statements

Plaintiffs made on their media tour about Lowell's client, and why it was so objectionable and

clearly unlawful. What the Court will *not* find in the Complaint is a single allegation about

Lowell accusing the Plaintiffs of doing or saying something they did not do or say.

      As detailed in Lowell's moving papers, when a speaker expresses a view about the

legality of a Plaintiff's conduct based on known facts, that is classically a protected legal

*opinion*. (ECF 11-1, at 20-21 (collecting cases).) By contrast, accusations of illegality are

actionable when they state or imply factually verifiable conduct. Calling someone a thief implies

that the person *did something*, and so is typically actionable. *See* RESTATEMENT (SECOND) TORTS

§ 566 cmt. b (1977) (using this example). But if, for example, a pop singer hears a song on the

radio that sounds too similar to one of his or her own songs, a public accusation of intellectual

property theft would be an *opinion*. No one would think the accusation implies any special

factual knowledge about the song on the radio. And it would make no difference if the

accusation came from the pop artist's lawyer. Plaintiffs cite *no case* in which a defamation claim

was allowed to proceed based on statements (whether by lawyers or nonlawyers) expressing the

speaker's legal opinion that undisputed conduct was unlawful.

      The Supreme Court's decision in *Milkovich v. Lorain Journal Co*., 497 U.S. 1 (1990)

illustrates the distinction Plaintiffs overlook. In *Milkovich*, a newspaper column accused a high

school wrestling coach of perjuring himself in a court hearing that overturned discipline by state

officials against the team for a brawl. *Id*. at 4-5. The coach had previously testified at an administrative hearing leading to the discipline. *Id.* at 4. The newspaper columnist—who personally attended the meet where the brawl broke out—argued that the coach had "reconstructed" his story for the court hearing, deviating from his prior testimony and breaking his "solemn oath to tell the truth." *Id*. at 5 n.2.  The Ohio courts found that the column merely expressed "legal conclusions" in a context—the sports page—that would be "construed as the writer's opinion." *Id*. at 9 n.4 (citation omitted). But the Supreme Court reversed, and held that the columnist's accusation of perjury was "sufficiently factual to be susceptible of being proved true or false." *Id.* at 21. For example, "[a] determination whether [the coach] lied in this instance can be made on a core of objective evidence by comparing, *inter alia*, [his] testimony [at the administrative hearing] with his subsequent testimony before the trial court." *Id*.  And the testimony could also be compared against what the columnist or others saw at the meet. *Id*.

What is lacking in this case is exactly this type of "factual" evidence that could prove whether Plaintiffs broke the law. Whether the wrestling coach in *Milkovich* committed perjury raised a provable fact question—*e.g.*, Did he make different statements under oath about the brawl?—but there is nothing like that here. There are no "facts" in dispute.  The agents do not deny what they said and did, and Lowell relied only on the same record.[3]

---

[3] Plaintiffs erroneously rely on cases where a defendant's accusations of criminal activity *were* provably false, such as cases about whether certain extortionate threats *actually occurred*, not whether undisputed conduct met the elements of extortion. *See Wade v. Wood*, No. 1:22-cv-1073, 2024 WL 1075482, at *2-3 (N.D. Ga. Mar. 12, 2024) (concluding that no reasonably jury could find that, as alleged, the defendant posted on social media that the plaintiff, the defendant's former law partner, threatened that if the plaintiff did not accept a certain settlement over the breakup of their law firm, the plaintiff would "publicly question [d]efendant's mental health"); *Punturo v. Kern*, No. 338727, 2018 WL 5276142, at *6-7 (Mich. App. Oct. 6, 2018) (finding "provable as false" whether the defendants told the news media that the plaintiff had "threatened him, extorted him, and sought to put him out of business with allegedly illegal business tactics").

In suggesting otherwise, Plaintiffs glibly suggest that the "truth" of the legal matters at issue is a simple either/or proposition: "It is either 'simply [a] felony' for [Plaintiffs] to discuss [previously-disclosed] information, or it is not. And there is either a 'cognizable legal protection' for the [Plaintiffs'] activities, or there is not." (ECF 16, at 12-13.) But any lawyer who has advised a client knows that applying legal principles to a set of facts rarely lends itself to black-and-white, either-or answers like this. Lowell's opinions about how § 6103 and Rule 6(e) apply to Plaintiffs' conduct—which he justifiably feels strongly about (*see* Section III, *infra*)—are simply not the type of *it-is-or-it-isn't* factual matters that could be definitively resolved by a trier of fact via objective evidence. Instead, the challenged statements represent pure, protected legal opinions with which Plaintiffs or anyone else are free to disagree.

### C.    Lowell Was Not Required to "Hedge" or Moderate His Opinions

Plaintiffs next argue that Lowell's legal opinion about their lawbreaking should be considered "assertions of verifiable facts" because he "did not hedge his accusations" but "instead spoke with finality." (ECF 16, at 12.) They further fault Lowell for "failing to disclose" that there is a circuit split on the application of § 6103 and for failing to disclose other points that, by Plaintiffs' lights, would show that Lowell was advancing "debatable" arguments. (*Id*. at 14, 20.) But the notion that speakers cannot express themselves in a bold or confident way, and must instead deploy Plaintiffs' preferred *on-the-one-hand-on-the-other* balancing—at the risk of a defamation judgment—is difficult to take seriously. The law is the opposite.

In *Ollman*, the D.C. Circuit held that a newspaper column describing a professor as a "Marxist" intent on indoctrinating students was a protected opinion, and, in doing so, the Court was clear that writers need not provide the "balance" that the subject of the writing would prefer. 750 F.2d at 971-82. It is expected, for instance, that newspaper columnists will provide one-sided opinions "without providing what might be considered the full picture." *Id.* at 986. They are

"after all, writing a column, not a full-length scholarly article or a book." *Id*. A columnist can

also be expected to truncate quotes or omit "the complete context in which the remarks

appeared[.]" *Id*. at 989. It may be "highly irritating when the context does not seem fully and

fairly stated," the Court added, but the "balm for the irritation . . . cannot be a libel suit, unless

triers of fact are to sit in editorial judgment." *Id*. Here, too, Lowell and Clark were not writing

"scholarly articles," but were zealously advocating for their client, and it is not for Plaintiffs to

sit in "editorial judgment" on how Mr. Biden's lawyers should do their job.

Plaintiffs go to great lengths to emphasize the importance of "context" in understanding

an allegedly defamatory statement, but the context of the letters here—written by lawyers for a

client whose case was being turned into a circus through Plaintiffs' actions—cuts against anyone

reading the letters as somehow giving a disinterested, "both sides" view. Where, as here, the

"circumstances surrounding an allegedly defamatory statement indicate that the person making

the statement has a special interest in the matter, courts have routinely held that a reasonable

observer would understand such a statement to be one of opinion, rather than fact." *Bellavia*

*Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015).

In *Brian v. Richardson*, 660 N.E.2d 1126 (N.Y. 1995), for example, a *New York Times*

op-ed advocated for an investigation into a software company's demise, and intimated that

plaintiff's wrongdoing ought to be part of the investigation. The New York Court of Appeals

held that the piece was protected opinion because (among other reasons) the author "disclosed

that he had been [the software company's] attorney, thereby signaling that he was not a

disinterested observer" and not providing "objective reportage." *Id*. at 1131 (citation omitted).

Here, it is ludicrous to think that anyone would be looking to letters by Lowell and Clark

for a neutral, treatise-like exposition about how § 6103 and Rule 6(e) would apply to the conduct

of Plaintiffs, who were in the midst of a months-long campaign for Lowell's and Clark's client to

face more serious charges. Equally ludicrous is the suggestion that, because Lowell is "one of the

country's foremost white collar defense and trial lawyers," his assertions are more likely to be

viewed as factual ones. (ECF 16, at 16.) The reality is the *opposite*: Lowell's job is to forcefully

advocate a position in the best interests of his client, and he would not be doing so if he wrote a

half-hearted letter littered with mealy-mouthed qualifications.

Any reader would understand this reality, and would understand that Lowell's

prominence does not make him somehow *less* of an advocate. Plaintiffs' argument on this point

implies that a statement made by a renowned lawyer could be considered a defamatory factual

assertion while the identical statement, made in the identical context, might be protected opinion

if made by a lesser-known attorney. They cite no authority for this bizarre proposition.[4]

Finally, Plaintiffs' view of the law would have profound practical consequences for free

speech that their brief totally ignores. As discussed in Lowell's moving papers, there are often

important public debates about how legal principles should apply to the conduct of public

officials and others (*e.g.*, Did President Trump engage in an "insurrection" under the Fourteenth

---

[4] Also bizarre is the argument that Clark referring to Plaintiffs' having committed "clear-cut" crimes—a point Plaintiffs repeat *eleven* times—was expressed so decisively that the statement was more like a fact than an opinion. (ECF 16, at 1, 2, 7, 12, 13, 14, 16, 20 (all quoting ECF 11-38, at 1).) There is no authority for this position, and it makes no logical sense. The difference between saying that Plaintiffs' conduct *clearly* amounted to a crime, versus saying it *likely* or *possibly* did so, is merely a difference in the speaker's expressed confidence level in the opinion. But all are *still opinions*. And even when a legal opinion is framed in definitive language, it still falls outside the realm of verifiable fact. Consider, for example, the case law on qualified immunity, where government officials can be held responsible only for violations of "clearly established" constitutional rights. Judges disagree on these issues all the time, *see*, *e.g.*, *Corrigan v. District of Columbia*, 841 F.3d 1022, 1041-47 (D.C. Cir. 2016) (Brown, J., dissenting); *Bame v. Dillard*, 637 F.3d 380, 388-400 (D.C. Cir. 2011) (Rogers, J., dissenting); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 225-36 (4th Cir. 2003) (Gregory, J., dissenting), because whether a right is or is not "clearly established" is not a "fact" to be deemed "true" or "false" but a legal *opinion*, that by its nature admits of differing judgments.

Amendment?) (*see* ECF 11-1, at 21-22), and Plaintiffs' position would utterly destroy the ability

for lively debate on these types of issues. When Plaintiffs argue, for example, that Lowell was

required to have "hedge[d] his opinion," and to have disclosed contrary views (ECF 16, at 12,

14, 20), they are advancing a view of defamation law that would force writers and speakers "to

provide only dry, colorless descriptions of facts, bereft of analysis or insight"—a view that, if

adopted, would greatly hamper "the robust debate among people with different viewpoints that is

a vital part of our democracy." *Partington v. Bugliosi*, 56 F.3d 1147, 1154 (9th Cir. 1995). The

Court should reject Plaintiffs' drastically misguided arguments, and dismiss this case.

## II.    Plaintiffs' "Second Basis" for Defamation Is Baseless

### A.    The Challenged Statements Say Nothing About Plaintiffs' Media Tour Disclosing New Information

Plaintiffs contend that Lowell's motion "ignores half of the defamatory message" at

issue—specifically, that the challenged statements not only accused Plaintiffs of crimes but

separately "accuse[d] [them] of disclosing confidential information that was not already in the

public domain." (ECF 16, at 1, 5.) These latter accusations are supposedly defamatory

"regardless of whether such disclosures would amount to a criminal violation." (*Id*. at 5.)

But the fundamental problem with this argument is that the challenged statements *have*

*nothing to do* with Plaintiffs' bogus distinction between information that was or was not

previously in the "public domain." Lowell did not "ignore" this separate defamation theory; it is

*nowhere* in the statements Plaintiffs challenge. The Complaint focuses on 12 specific statements,

set forth in the chart below. As the Court can readily see, nothing in these statements says

anything one way or the other about whether Plaintiffs' media interviews revealed anything new:

| Allegation/Cite | Relevant Complaint Excerpt |
|---|---|
| Defamatory Allegation A<br><br>(Compl. ¶ 20 (quoting ECF 11-12).) | "By that time, Lowell understood the April 21, 2023, letter [from Christopher Clark] to falsely accuse one or both Plaintiffs of '**leak[ing] information to . . . the press, apparently in violation of federal law**, regarding the investigation of our client [Biden]' and Lowell knew readers of his September 14 letter would understand the same thing. ('Defamatory Allegation A')." |
| Defamatory Allegation B<br><br>(Compl. ¶ 23 (quoting ECF 11-38, at 1).) | "Lowell's September 14, 2023, release to the media republished a June 29, 2023, letter from Clark to the DOJ Inspector General Michael Horowitz. That republication falsely stated Shapley and Ziegler had **disseminated 'grand jury and taxpayer information**, including through multiple nationally-televised on-camera interviews of [Shapley],' which it called a '**clear-cut crime unprotected by any whistleblower statute or other federal law[.]**' ('Defamatory Allegation B')." |
| Defamatory Allegation C<br><br>(Compl. ¶ 23 (quoting ECF 11-38, at 1).) | "Lowell's republication of Clark's [6/29/2023] letter also expressly accused Shapley and Ziegler of committing a crime: 'At this point it is irrefutable that **federal agents' criminal acts** have inflicted irreversible damage.' ('Defamatory Allegation C')." |
| Defamatory Allegation D<br><br>(Compl. ¶ 24 (quoting ECF 11-38, at 3).) | "The June 29, 2023 Clark letter republished by Lowell also falsely stated: '[I]t is now apparent that IRS Supervisory Special Agent Gary Shapley is the source of at least many of the most **damaging and troubling leaks**.' ('Defamatory Allegation D')."[5] |
| Defamatory Allegation E<br><br>(Compl. ¶ 25 (quoting ECF 11-38, at 3).) | "That same letter falsely accused Ziegler of wrongful and illegal conduct, stating 'yet another federal agent [Joseph Ziegler] . . . **illegally leaked information protected by Rule 6(e) and Section 6103[.]**' ('Defamatory Allegation E')." |

---

[5] Plaintiffs' opposition makes clear that Shapley "does not allege that 'Allegation D' is defamatory based on Lowell identifying him as the 'source'" (ECF 16, at 8 n.2), confirming that there is only one, singular, alleged defamatory message at issue: that Plaintiffs broke the law. Regardless, Allegation D's reference to Shapley being a "source" of "leaks" could not possibly be defamatory. The reference appears in a letter from Clark, who follows that statement with a description of various news stories indisputably sourced ultimately to Shapley, such as reporting on his lawyer's letter to Congress about the Biden investigation, and Shapley's own participation in an interview on CBS News. (*See* ECF 11-38, at 3-4.)

| Allegation/Cite | Relevant Complaint Excerpt |
| --- | --- |
| Defamatory Allegation F<br><br>(Compl. ¶ 25 (quoting ECF 11-38, at 4).) | "It continued of Shapley: '[T]here is **no justification or cognizable legal protection for his disclosures** of confidential grand jury and tax information . . . , and such disclosures are **not protected by any exceptions to either Rule 6(e) or Section 6103.** Supervisory Special Agent Shapley's **unlawful disclosures . . . are quite simply felonies**.'" ('Defamatory Allegation F')." |
| Defamatory Allegation G<br><br>(Compl. ¶ 26 (quoting ECF 11-39, at 3).) | "Lowell's September 14, 2023, republication to the media also included a June 30, 2023, letter Lowell wrote to Chairman Jason Smith of the House Ways and Means Committee, accusing Shapley of having made '**unauthorized disclosures**.' ('Defamatory Allegation G')." |
| Defamatory Allegations H-K<br><br>(Compl. ¶ 27 (quoting ECF 11-41, at 3, 8 & n.24).) | "Lowell's September 14, 2023, republication to the media also included an August [14], 2023, letter to U.S. Attorney David Weiss in which Lowell falsely stated that Shapley and Ziegler '**illegally disclosed grand jury and tax return information**' ('Defamatory Allegation H'); that their disclosures were '**not protected by any exceptions to either Rule 6(e) or Section 6103**' ('Defamatory Allegation I'); that those disclosures '**are quite simply crimes**' ('Defamatory Allegation J'); and that the agents had made '**knowing violations of the law that constitute contempt and felony crimes**' ('Defamatory Allegation K')." |
| Defamatory Allegation L<br><br>(Compl. ¶ 28 (quoting ECF 11-42, at 2).) | "Lowell's September 14, 2023, letter itself includes defamatory statements, including that the agents '**violate[d] federal laws protecting grand jury and tax information**.' ('Defamatory Allegation L')." |

These statements do *not* complain that Plaintiffs disclosed *new* information to the media; the point is that Plaintiffs' misconduct spanned *both* their Congressional testimony *and* their media tour. The full context of the letters reinforces this point. For example, Lowell wrote in his August 14, 2023 letter to Special Counsel Weiss that the Congressional "transcripts are replete with illegal leaks of grand jury information, going far beyond disclosing *government misconduct, the whole point of *legitimate* whistleblowers." (ECF 11-41, at 3 (emphasis in original).) Lowell's letter further explained that, while whistleblowers are supposed to expose "prosecutorial misconduct," Plaintiffs instead disclosed to Congress "commentary and impressions of the facts

- 13 -

of the investigation, disclosure of witness interviews . . . and one-sided case conclusions." (*Id*. at 1.) A separate section of Lowell's letter, under the heading "Televised Interviews," details Plaintiffs' shocking and highly prejudicial media tour, and *nothing* in that section concerns whether the interviews went beyond what was already in the public domain. (*Id*. at 6-8.)

Plaintiffs place such importance on the question of whether their media appearances disclosed new information because they apparently believe in an unwritten exception to § 6103 and Rule 6(e) embodying an *all-or-nothing* confidentiality principle: once a piece of information is disclosed to *someone* in a public setting, then any government official, by Plaintiffs' theory, is free to make unlimited further disclosures to *anyone*. This theory is a matter of legal *opinion* where the legal authorities weigh heavily against Plaintiffs. (*See* Section III, *infra.*) But, regardless, the allegedly defamatory letters do not adopt Plaintiffs' *all-or-nothing* view of confidentiality and thus simply do not assert *anything* about whether their media tour exceeded the scope of their Congressional transcripts. Plaintiffs cannot state a defamation claim based on Lowell having said something on an issue about which he said nothing.

**B.      Regardless, Plaintiffs Disclosed New Information to the Media**

Even if there were some relevance to whether Plaintiffs' media interviews did or did not stay within the bounds of information from their Congressional testimony, Plaintiffs' arguments should still be rejected, because they *did* disclose certain new information.

First, the media tour began *before* the Congressional testimony, when Shapley and his lawyer gave interviews describing their concerns over a "high profile" investigation that the media identified (without contradiction) as the Hunter Biden investigation. (*See* ECF 11-1, at 8-11.) Plaintiffs argue that the only disclosures they made were on an anonymized basis, *i.e.*, that "Biden's name was not given to the media by" Plaintiffs and that they "have no control over" the

media's decision to publicly draw the connection to Biden. (ECF 16, at 27-28.)[6] But there is no exception in either § 6103 or Rule 6(e) for disclosing information on an anonymized basis, and Plaintiffs cite *no authority* supporting their position. To the contrary, the Supreme Court has squarely held that merely omitting the taxpayer's name and other identifying information from a disclosure about a tax return does "*not* deprive it of protection under § 6103(b)." *Church of Scientology of Cal. v. Internal Revenue Serv.*, 484 U.S. 9, 18 (1987) (emphasis added).

Lowell's moving brief cited the *Scientology* case, but Plaintiffs' opposition has no answer—because there is no good one. (*Compare* ECF 11-1, at 23-24, *with* ECF 16, at 27-28.) The logic behind *Scientology* is eminently sensible. If government officials could routinely disclose information about tax returns and criminal investigations so long as the subjects' names were redacted or concealed, that would open the door to industrious members of the press or public ultimately connecting the dots—as happened here—and would totally undermine the confidentiality concerns motivating § 6103 and Rule 6(e). That is why Plaintiffs' hypothesized exception for anonymized information is simply not the law.

Second, Plaintiffs *did* disclose new information to the media. In one particularly egregious example, Ziegler told Fox News—while charges against Biden were still pending—the following: "[W]hen you work a criminal case, there's a thing called willfulness, whether someone intentionally, with knowledge, either evaded their income taxes or filed a false return,

---

[6] The notion that Shapley or his lawyer never so much as confirmed for the media outlets (whether explicitly or implicitly) that the investigation's subject was Biden is completely implausible because a story about an investigation into an unknown taxpayer—as opposed to one about the sitting President's son—would have little to no news value. When Shapley, for example, participated in a nationally-televised CBS News interview focused on Biden, he was, in effect, providing confirmation that CBS News correctly understood the subject of the story to be Biden. (*See* ECF 11-14, 11-15.) That he incanted the words, "I can't confirm or deny the subject of this investigation" (*see* ECF 11-14, at 2), does not change the reality that his participation itself provided obvious confirmation to anyone watching.

. . . [A]nd in this case, we provided a ton of evidence that showed willfulness." (ECF 11-27, at 3.) Apart from the obvious prejudice of a government official who once worked on a case commenting on the strength of the evidence, Ziegler did not make any similar characterization in his Congressional testimony. Plaintiffs attempt to stitch together snippets of Ziegler's testimony to suggest that this comment was nothing new (ECF 16, at 26-27 n.15), but nowhere did Ziegler testify to Congress about the strength of the "willfulness" evidence. (ECF 11-4.) As a further example, Ziegler told CNN that the investigative team "all agreed for felony and misdemeanor tax charges" for years 2017, 2018, and 2019, and expressed surprise that Mr. Biden's original plea in Delaware did not include those felony counts (or any felonies). (ECF 11-25, at 5.) As Ziegler said, under DOJ policy, "if you have the felony and you have the evidence there, and there is also a misdemeanor, you have to charge the felony." (*Id.*) Yet, his Congressional testimony mentioned felony charges related *only* to 2014 and 2018 (not 2017 or 2019). (ECF 11-4, at 33, 62.) These new disclosures would be unlawful, even under Plaintiffs' (misguided) view.

## III.    Plaintiffs Repeatedly Broke the Law

Plaintiffs spend considerable effort trying to twist the reality that the overwhelming weight of legal authority is that their behavior was criminal. (*Compare* ECF 11-1, at 22-27, *with* ECF 20-28.) As detailed below, their legal arguments otherwise are unpersuasive. But the Court need not take a side, and should not lose sight of the more fundamental point: these matters are legal issues that are fair game for debate.

### A.    Plaintiffs' Disclosures to Congress Violated Rule 6(e)

Plaintiffs' entire theory of the case hinges on the notion that their disclosures to Congress were lawful and correspondingly insulated their media tour. But this argument falls apart at the first step with respect to Rule 6(e). While § 6103 contains an exception for disclosure to certain Congressional committees, *see* 28 U.S.C. § 2103(f), *there is no such exception in Rule 6(e). See*

Fed. R. Crim. P. 6(e). Thus, Plaintiffs had no business disclosing grand jury information to Congress. And that wrongful act does not somehow inoculate their subsequent media tour. Just as "a prosecutor is not free to leak grand jury material and then make a self serving claim that the matter is no longer secret," *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1004 n.13 (D.C. Cir. 1999), Plaintiffs were not allowed to break Rule 6(e) through their Congressional testimony and then claim that their prior unlawfulness insulated their media tour from further violations.

Clearly recognizing this problem, Plaintiffs make a striking claim—which is nowhere in the Complaint—that they "never disclosed grand jury information to Congress" in the first place. (ECF 16, at 21.) This is complete nonsense. Rule 6(e) requires secrecy for any "matter occurring before the grand jury," Fed. R. Crim. P. 6(e), and has been interpreted to protect broadly not only what witnesses say on the witness stand, but "the strategy or direction of the investigation." *In re Motions of Dow Jones & Co.*, 142 F.3d 496, 500 (D.C. Cir. 1998) (internal citations and quotation marks omitted). Thus, for example, even disclosing grand jury subpoenas themselves (without any disclosure of the information provided in response) violates Rule 6(e) because "the subpoenas and the dates on which they are issued tend to reveal the direction of the relevant investigation." *Lopez v. Dep't of Just.*, 393 F.3d 1345, 1350 (D.C. Cir. 2005). And, similarly, draft indictments—regardless of whether grand jury witnesses are named or quoted—are protected because they "necessarily show the potential direction of the grand jury proceedings" and show contemplated charging decisions that ultimately trace back to "testimony and other information presented to" the grand jury. *Jud. Watch, Inc. v. Nat'l Archives & Recs. Admin.*, 214 F. Supp. 3d 43, 54 (D.D.C. 2016), *aff'd*, 876 F.3d 346 (D.C. Cir. 2017).

Here, the whole thrust of Plaintiffs' testimony to Congress was a detailed chronology of how the investigation unfolded and how, in their view, it went off track. And it is difficult to

envision how Plaintiffs would have learned many of the facts they disclosed except via grand

jury subpoenas. (*See*, *e.g.*, ECF 11-3 at 97, 107 (Shapley discussing expenses involving

prostitutes and approving "document requests"); ECF 11-4 at 79, 129-30 (Ziegler discussing tax

deductions, "Venmo" transactions, and "get[ting] records from" Columbia).) The information

they told Congress falls squarely within Rule 6(e), and so Plaintiffs had no right to disclose it in

the first place—or to repeat it on a media tour.

### B.    Public Disclosure Does Not Categorically Immunize Subsequent Violations

As detailed in Lowell's moving brief, the overwhelming weight of authority is that public

disclosure in one domain does *not* insulate further disclosures from the scope of § 6103 or Rule

6(e). (*See* ECF 11-1, at 22-27.) Plaintiffs are, at best, on the wrong side of a 4-1 circuit split on

the issue of whether there is an unwritten exception in § 6103 for previously-disclosed

information. (*Id*.) And, with respect to Rule 6(e), the D.C. Circuit has held that it "does not

create a type of secrecy which is waived once public disclosure occurs." *In re North*, 16 F.3d

1234, 1245 (D.C. Cir. 1994) (citation omitted). In response, Plaintiffs cite a line of cases in

which "courts in this District . . . have concluded that a notice of lien [publicly filed by the IRS]

does not give rise to an unauthorized disclosure action." *Pollinger v. United States*, 539 F. Supp.

2d 242, 253 (D.D.C. 2008) (cited ECF 16, at 23). But the reasoning of those cases—that

disclosure in that context is "necessary to collect on taxes assessed," *Glass v. United States*, 480

F. Supp. 2d 162, 166 (D.D.C. 2007) (citation omitted)—completely undermines Plaintiffs'

argument. Whereas the IRS cannot collect from delinquent taxpayers without tools like public

liens on property, there is nothing "necessary" about Plaintiffs going on cable news programs to

air the internal disagreements and specifics about how a criminal case is being handled.

The reason Plaintiffs apparently cannot find case law in this District for their extreme *all-*

*or-nothing* theory of confidentiality—that one public disclosure insulates all others—is because

it is baseless. Section 6103 does not contain their unwritten exception, and so, when government officials disclose "information otherwise available to the public," that information "still f[alls] within the protection of § 6103." *Bancroft Glob. Dev. v. United States*, 330 F. Supp. 3d 82, 101 (D.D.C. 2018) (quoting *Mallas v. United States*, 993 F.2d 1111, 1121 (4th Cir. 1993)).

Finally, Lowell's moving papers explain why the majority position's reasoning is compelling: (1) there is nothing in the text of Rule 6(e) or § 6103 containing the exception Plaintiffs invoke; (2) Congress included "public domain"-type exceptions in other contexts, indicating that the absence of an exception in this context was *deliberate*; and (3) confidentiality in the real world is not an all-or-nothing concept, where affected individuals cease to have any "interest in limiting disclosure or dissemination" of information the moment it is disclosed to somebody, somewhere. *Mallas*, 993 F.2d at 1120. (*See* ECF 11-1, at 25-26.) Plaintiffs' opposition has no response to these points.

## IV.    Plaintiffs Fail to Plead Facts Showing Actual Malice

Plaintiffs concede that they must plead facts meeting the "daunting" actual malice standard, *McFarlane v. Esquire Mag.*, 74 F.3d 1296, 1308 (D.C. Cir. 1996), *i.e.*, facts showing that Lowell published each statement at issue with "'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (citation omitted). As discussed, the notion that Lowell could somehow have factual "knowledge" about the "truth" of how § 6103 and Rule 6(e) apply to Plaintiffs' conduct is incoherent. But, regardless, the Complaint simply pleads *no facts* to suggest that Lowell somehow published the letters "knowing" that Plaintiffs' conduct was in "fact" lawful. (ECF 11-1, at 27-31.) Plaintiffs' efforts to show otherwise are meritless.

Plaintiffs first argue that a lawyer of Lowell's stature "knows it is not illegal to disclose grand jury information already in the public domain." (ECF 16, at 33.) But this is itself a

statement *contrary to the overwhelming weight of legal authority* (*see* Section III, *supra*; ECF 11-1, at 22-27), not something Lowell could ever "know" to be true.

The remainder of Plaintiffs' argument on actual malice boils down to the assertion that Lowell did not publish the statements at issue from the vantage point of a disinterested observer. Plaintiffs, for example, fault Lowell for not having disclosed legal authority that supposedly would show Plaintiffs acted lawfully. (ECF 16, at 33-36.) And Plaintiffs accuse Lowell of writing the letters with an "antagonistic and oppositional" attitude and an "acerbic tone and tenor." (*Id*. at 36, 40.) But these arguments fundamentally misunderstand that "'actual malice' is a term of art that 'focuses on what the defendant knew about the veracity of the statements,' and should not 'be confused with . . . ill will or 'malice' in the ordinary sense of the term.'" *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 264 n.3 (D.D.C. 2017) (citation omitted). That Lowell does not think highly of Plaintiffs is both unremarkable—their brazen wrongdoing was highly prejudicial to Lowell's client—and beside the point.

Further, as discussed, it was not Lowell's job to present an academic, treatise-like exposition on all the ways § 6103 or Rule 6(e) *might* be interpreted to apply, or to not apply, to Plaintiffs' media tour. Plaintiffs cite no case suggesting that it reflects "actual malice" to advocate for a client in a way that lacks perfect "balance" (an impossibly subjective concept, in any event). Plaintiffs rely on cases involving journalists purporting to be neutral, which are inapposite here, where Lowell identified himself as and was clearly advocating for a client, not purporting to be a neutral reporter.

The court's decision in *Price v. Viking Penguin, Inc*., 676 F. Supp. 1501 (D. Minn. 1988), is instructive. In *Price*, an FBI agent who investigated the killing of two other agents sued the author of a book claiming that the accused murderer, who was ultimately convicted, was actually

innocent. As evidence of actual malice, the investigator highlighted that the author had agreed to share the book's royalties with a fund devoted to overturning the conviction. But, as the court explained, the financial arrangement did "no more than reinforce the already apparent one-sidedness of the book," which, "[l]ike a legal brief or a political tract," was not purporting to provide a "neutral description of events." *Id*. at 1513. If anything, the fact that the author was financially committed to reversing the conviction showed "his sincere belief in the cause he promoted and the words he wrote"—the *opposite* of actual malice. *Id*.

Here, the fact that Lowell was advancing the interest of his client, Biden, would be apparent to anyone reading the letter and, if anything, would undermine any suggestion that Lowell—who devotes a large portion of his career to representing criminal defendants—would secretly harbor an understanding of the law that favored prosecutors and investigators over the subjects of investigations.

Even if the Court were to transpose the case law for journalists into this context, actual malice is not shown merely because a writing omits information a plaintiff would like to have been included. Articles in newspapers and magazines commonly take an "adversarial stance" and doing so is "fully consistent with professional, investigative reporting" and, without more, "not indicative of actual malice." *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987). It is not for a court to second-guess whether a writing has "achieve[d] some undefined level of objectivity." 1 Rodney A. Smolla, Law of Defamation § 3:68 (2d ed. 2024) (citation omitted). It is instead perfectly commonplace—and not actual malice—for a writer to have "selected some facts believed to be true that were harmful to the plaintiff while omitting others," or to have "failed to present an objective picture." Hon. Robert D. Sack, Sack on Defamation § 5:5.2[B], at

5-113–5-115 (5th ed. 2024) (collecting cases). A defendant only veers into actual malice in

extreme cases, where there is "conscious manipulation of the evidence." Smolla, *infra*, § 3:69.

Plaintiffs cite *Schiavone Constr. Co. v. Time*, *Inc.*, 847 F.2d 1069 (3d Cir. 1988) (cited

ECF 16, at 33), which highlights the difference. There, a reporter gained access to certain

confidential FBI files and reported that "the name of [the plaintiff] appeared several times in the

bureau's reports on the 1975 disappearance of former Teamster Boss Jimmy Hoffa," and further

stated that this fact "would surely have intrigued . . . the special prosecutor" investigating

Hoffa's death. *Id*. at 1072. In other words, the reporter clearly intimated that the FBI had reason

to suspect the plaintiff was involved in Hoffa's murder. Omitted from the article, however, was

the fact that a confidential FBI memo *itself* found, with respect to the plaintiff, no evidence of

"any criminality, or organized crime associations." *Id. Schiavone* presents an extreme fact

pattern of manipulated facts and does not resemble the case at hand.

## V.    Plaintiffs' Republication Allegations Are Inadequate

The Complaint should be dismissed on the independent ground that Plaintiffs fail to

allege facts sufficient to identify "the person or persons to whom the statements were made or

published." *Vreven v. Am. Ass'n of Retired Persons*, 604 F. Supp. 2d 9, 15 (D.D.C. 2009)

(citations omitted). All that is alleged is a publication to the "media" (ECF 1 ¶ 19), which is an

enormous and undefined class of persons. (*See* ECF 11-6, at 33 n.7.)

Plaintiffs respond by attacking a strawman, arguing that defamation claims need not be

pleaded "with particularity." (ECF 16, at 42.) But the basic Rule 8 pleading standards still

require Plaintiffs to plead facts giving Lowell fair notice of the essential claim against him—

including facts giving notice about to whom Lowell supposedly published the statements at

issue. (Seemingly recognizing the problem, Plaintiffs propose amending their Complaint to

allege that one reporter told others the at-issue letters "had been sent to her"—an allegation that, tellingly, does *not* identify Lowell as the sender. *See* Section VI, *infra*.)

Courts in this District and across the country have concluded that a complaint that, as here, fails to adequately identify the "listener" of the alleged defamatory statements does not "give defendant 'fair notice'" under Rule 8 and should be dismissed. *Vreven*, 604 F. Supp. 2d at 16 (dismissing case over statements to unspecified group of plaintiff's co-workers).[7]

## VI.    The Court Should Not Grant Plaintiffs Leave to Amend

Plaintiffs should not be granted leave to amend because the proposed, new allegations would not change the fact that the complaint, even as amended, "would not survive a motion to dismiss." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). Plaintiffs append to their opposition a chart of seven new allegations (*see* ECF 16-1), but, as detailed below, none can possibly remedy the deficiencies discussed above.

---

[7] *See also*, *e.g.*, *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1153 (5th Cir. 2021) ("To plead defamation in federal court, a plaintiff generally must specify when and where the statement was published. Otherwise, the claim may be too vague to give adequate notice to the defendant of the claim he must contest."); *Sebastiani v. Brooklyn Hosp. Ctr.*, No. 19-CV-253 (PKC), 2019 WL 3281010, at *5 (E.D.N.Y. July 19, 2019) ("The mere allegation that defamatory statements were made to another unidentified residency program is too indeterminate to provide sufficient notice so that Defendants can prepare their defense"); *Jackson v. Denmark Tech. Coll.*, No. 1:17-03431-MGL, 2018 WL 3729743, at *6 (D.S.C. Aug. 6, 2018) ("Without revealing to whom the defamatory statements were made, however, [plaintiff] has not properly pled the publication element of defamation, and thus she has not met the pleading standards under Fed. R. Civ. P. 8(a)(2) . . . .."); *Yukos Cap. S.A.R.L. v. Feldman*, No. 15-cv-4964, 2016 WL 183360, at *1 (S.D.N.Y. Jan. 7, 2016) ("[E]ven under the liberal standard of Rule 8, to establish a claim for defamation, the complaint must identify . . . the third parties to whom the statements were published.") (citation omitted); *PAI Corp. v. Integrated Sci. Sols., Inc.*, No. C-06-5349 JSW, 2007 WL 1229329, at *8 (N.D. Cal. Apr. 25, 2007) (noting that "countless district courts have found that the requirements of Rule 8 have not been met in cases where libel and slander claims failed to allege the substance of the statements and/or the time and place in which they were made" and collecting cases); *Rafferty v. Halprin*, No. 90 Civ. 2751, 1991 WL 148798, at *7-8 (S.D.N.Y. July 26, 1991) (rejecting claim because plaintiff merely alleged that defendant made defamatory statements to "the press and 'potential employers of plaintiff'").

**Comments from Republican Congressmen (Rows 4 and 5)**. The fact that two
Republican Congressman made comments during hearings—bereft of analysis and with no
indication that anyone else agreed—suggesting that they viewed Plaintiffs' public testimony as
fair game for further public discussion in the media does not mean that those views somehow
represent the "truth" about the law that Lowell was bound to adopt or about which a contrary
legal opinion could be actionable.

**The Unsealing of Documents in Delaware (Rows 7 and 8)**. The Republican Chair of
the House Ways & Means Committee sought to file on the public docket in Mr. Biden's
Delaware criminal case four documents that, as the Congressman explained, were "publicly
available on the Committee's website and ha[d] been since June 22, 2023." (Michael Reply Decl.
Ex. G, at 4.) The judge declined to seal those documents because, under the governing sealing
standards, Biden "failed to make any specific showing of harm and ha[d] failed to address the
documents sought to be sealed on an individual basis." (*Id*. Ex. H, at 2.) The Order did not
mention or purport to analyze § 6103 or Rule 6(e), much less provide any support for the notion
that public disclosure of information to Congress created a license for government officials to go
on a media blitz to talk about a confidential investigation.

**Shapley's Denial of "Leaking" Information to the *Washington Post* (Row 2)**. Shapley
alleges that his lawyers copied Lowell on a letter to the *Washington Post* supposedly proving that
Shapley was not the source for an October 6, 2022 story about the Biden investigation. This
letter has nothing to do with the issues at hand. Neither Lowell nor Clark ever accused Shapley
of being the source of that story, and Plaintiffs have confirmed that allegations about Shapley
being the "source" for news stories are *not* at issue in this case. (*See* n.5, *supra*.). Whatever
Shapley may or may not have leaked to the *Washington Post* in 2022 does not change the fact

that he went on to commit crime after crime in discussing the Biden investigation with dozens of other media outlets throughout 2023 and 2024.

**The Lack of IRS Discipline (Row 1)**. That Shapley and Ziegler claim they have yet to be disciplined by the IRS is not probative whatsoever as to whether they broke the law (or whether Lowell is entitled to express his opinion that they did), especially because discipline would put the IRS in a delicate position in light of the pending litigation against it for Plaintiffs' illegal leaks. *See Biden v. U.S. Internal Revenue Serv.*, No. 23-cv-02711-RC, 2024 WL 4332072 (D.D.C. Sept. 27, 2024) (denying motion to dismiss). It is especially peculiar for Plaintiffs to suggest that the IRS blessed their conduct, because they have publicly alleged their superiors retaliated against them. (Michael Reply Decl. Ex. I, at 2 (Shapley: "The IRS just has a smothering blanket on me hoping that I quit, that they find some way to terminate me . . . .").)

***Politico*'s Receipt of Lowell's September 14, 2023 Letter to Congress (Row 3)**. A *Politico* reporter allegedly told two people that Lowell's September 14, 2023 letter "had been sent to her," and Plaintiffs claim that this is relevant to pleading the "publication element." (ECF 16-1, at 1.) But Plaintiffs engage in a sleight of hand, blurring what the reporter said and what Plaintiffs want the reader to assume. The reporter's quote, phrased in the passive voice, does not state who sent the letter to *Politico.* (Lowell emphatically denies that he did.) The fact that *someone else* (*e.g.*, Congressional staffers who received the letter) may have published the letter to *Politico* does not amount to grounds for a defamation claim against Lowell, who, as Plaintiffs concede, was fully privileged to send the letters to Congress in the first place. (ECF 16, at 38.)

## CONCLUSION

For the reasons stated, and those in Lowell's moving papers, the Court should dismiss the Complaint with prejudice.

Dated: January 17, 2025

STEPTOE LLP

By: _/s/ Michael E. Stoll_
    Michael E. Stoll
    Jason M. Weinstein*
    1330 Connecticut Avenue, NW
    Washington, D.C. 20036
    (202) 429-3000
    mstoll@steptoe.com
    jweinstein@steptoe.com

    Charles Michael*
    1114 Avenue of the Americas
    New York, New York 10036
    (212) 506-3900
    cmichael@steptoe.com

    *admitted _pro hac vice_

    _Counsel for Defendant Abbe Lowell_